**STATE**

v.

**Antonio GOMES.**

**No. 2002–585–C.A.**

Supreme Court of Rhode Island.

Sept. 1, 2005.

---

Aaron L. Weisman, Esq., Providence, for Plaintiff.

Catherine A. Gibran, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

ROBINSON, Justice.

The defendant, Antonio Gomes, was indicted for the murder of Mary Brown, and he was subsequently convicted by a jury of second-degree murder. He has appealed to this Court, contending that reversal of his conviction is required in light of this Court's decisions in *State v. Dearmas*, 841 A.2d 659 (R.I.2004), and *State v. DiStefano*, 764 A.2d 1156 (R.I.2000). He further contends that the trial justice committed reversible error when he declined to admit into evidence certain hearsay statements that he maintains were critical to his defense. Having reviewed the record and the legal arguments, we discern no reversible error, and we therefore affirm the judgment of conviction.

### Facts and Travel[1]

On August 27, 1999, at approximately 3:30 p.m., the body of fifty-three-year-old Mary Brown was found on her bed, lying face up and partially clad, in her third-floor Dodge Street apartment in Provi-

dence. Doctor Michael Sikirica, deputy chief medical examiner for the State of Rhode Island, testified that Ms. Brown had been stabbed three times in the neck and strangled. He estimated that she most likely had been killed between 8:45 p.m. on August 26 and 8:45 a.m. on August 27, 1999.

Ms. Brown's long-time friend Willie Reese testified that he routinely visited with Ms. Brown on his way home from work in order to socialize and to consume alcohol. He further testified that, before he went to her apartment on August 27, he had been concerned for her safety after having been unable to reach her by telephone during his lunch break and after having witnessed an incident between Ms. Brown and her live-in boyfriend, defendant Gomes, on the previous day. Mr. Reese's worst fears were realized when he discovered the dead body of Ms. Brown in the apartment. He immediately notified the police of his discovery.

Mr. Reese testified that, on the afternoon of the previous day, August 26, he stopped by Ms. Brown's apartment, as was his custom, and that both she and defendant Gomes were present at that time. It was the testimony of Mr. Reese that, even though all three of them would normally drink alcohol together on such occasions, Ms. Brown did not join in the drinking on that particular day because she had only recently been released from the hospital, where she had been treated for alcohol-related problems.

Mr. Reese further testified that, in the evening of the same day (August 26), defendant had been drinking from a half-pint bottle of vodka that he kept in a brown paper bag. At one point, defendant went into the bathroom; and, while he was

---

1. Additional facts will be supplied in the analysis portion of this opinion as may be necessary to clarify our discussion of the various legal contentions.

there, Ms. Brown took the paper bag and the vodka bottle and concealed both in a large pocket in her dress. Upon his return from the bathroom, defendant noticed that his vodka bottle was missing, and he demanded that Ms. Brown tell him where it was. Ms. Brown denied all knowledge of the whereabouts of the vodka, a which point defendant became verbally and physically abusive and threatened to kill her unless she returned the bottle. Mr. Reese testified that, when Ms. Brown tried to leave the apartment, defendant blocked her exit and told her that she was not going to be allowed to go anywhere "unless I get my vodka."

Mr. Reese said that he managed to persuade defendant to allow Ms. Brown to leave, but that shortly thereafter defendant followed her outside while Mr. Reese remained in the apartment. Mr. Reese testified that he then heard Ms. Brown scream and that, when he went outside to investigate, he observed defendant sitting in the back of a police car.

Reserve Police Officer Timothy M. Homerston and trainee Reserve Police Officer Joseph Waleryszak of the Providence Police Department's Housing Unit both testified at defendant's trial.[2] On August 26, at approximately 7:30 p.m., they were patrolling the elderly high-rises and the housing projects of the city when an unidentified female flagged down their vehicle. The officers spoke with the woman, and she directed them towards the site of an argument that was in progress outside a nearby Providence Housing Authority apartment building on Dodge Street.

The officers then drove to the Dodge Street apartment building in their patrol car. When they arrived at the entrance to the building, they observed an altercation that was in progress and that involved a man (later identified as defendant) and a woman (later identified as Mary Brown). Reserve Officer Homerston testified that he saw Ms. Brown clutching onto the railing of the outside stairway of the apartment building, while defendant was grabbing her around the waist and attempting to pull her up the steps into the building. Reserve Officer Homerston further testified that, while defendant was pulling Ms. Brown in that manner, he heard her saying: "Help." "Get him off me." "Get him away from me."[3]

Reserve Officer Homerston proceeded to separate defendant from Ms. Brown. He then handcuffed defendant and placed him in the patrol car, while Reserve Officer Waleryszak spoke to Ms. Brown. Reserve Officer Homerston then moved back and forth between defendant and Ms. Brown in order to ascertain what had happened.

Shortly thereafter, Reserve Officer Homerston's supervisor, Officer Paul O'Rourke, arrived. Officer O'Rourke spoke with the reserve officers, and he then spoke with Ms. Brown. Ms. Brown refused Officer O'Rourke's offer of assistance, and she also refused to press any charges against defendant. She did request, however, that defendant be told to leave her apartment. Officer O'Rourke then instructed Reserve Officer Homerston to release defendant and to accompany him to Ms. Brown's apartment so that

2. According to the testimony of Reserve Officer Waleryszak, a reserve police officer is a sworn police officer who does not receive any remuneration. Reserve Officer Homerston indicated that, although his position was part time and unpaid, he had the same responsibilities as a fully paid police officer.

3. Reserve Officer Homerston also testified that the tone of Ms. Brown's voice at that time was "[s]haky, nervous" and that her volume was "[p]retty loud."

he could collect his medication and some other personal belongings.

Reserve Officers Homerston and Waleryszak accompanied defendant and Ms. Brown to her apartment. Ms. Brown retrieved defendant's medication and other personal belongings while the reserve officers confiscated defendant's keys to the building and to Ms. Brown's apartment. Ms. Brown then gave defendant the above-mentioned personal effects.

As the reserve officers were escorting defendant out of the apartment, he kept asking, "Why are you doing this to me? Why are you making me leave?" Reserve Officer Homerston further testified that, once defendant was outside, he was instructed "not to return to the area." The defendant was also informed that "if he was caught back on the property he would be arrested for trespassing." At that point, the officers observed defendant walking away from the area.

At approximately 10:30 that night (August 26), Mary Brown spoke with her daughter, Nancy Perry, by telephone from her apartment. Ms. Perry testified that, in that conversation, her mother "sounded upset." According to Ms. Perry, her mother told her that she had put defendant out of her apartment, and she added that she was "just tired of him." Although in that conversation with her daughter Mary Brown did not describe with specificity the events leading up to defendant's exclusion from her apartment earlier in the evening, Ms. Perry was nevertheless concerned about the whereabouts of her mother's keys to the apartment, and she asked her mother to see whether she could locate them. When Ms. Brown returned to the telephone, she informed her daughter that she could not find her keys; she said that they were not on her dresser, where she usually kept them. The conversation ended shortly thereafter. Ms. Perry is the last person known to have spoken with Ms. Brown.[4]

As previously indicated, the police were notified by Willie Reese on the afternoon of August 27 that Mary Brown appeared to be dead in her apartment. One of the investigating officers, Providence Police Detective John Corley, testified that, when he arrived at the crime scene, he did not observe any sign of forced entry into the apartment or any indication that the apartment had been burglarized. He further testified that he observed what appeared to be a cord from a jacket lying on the floor next to the bed where Mary Brown's body was found. Detective Corley further testified that, during the course of his investigation of Ms. Brown's death, he learned that there had been a recent disturbance involving defendant and Ms. Brown. He also learned that defendant was at that very time being treated in the emergency room at Rhode Island Hospital.[5] Shortly thereafter, at approximately 6 p.m. on August 27, Detective Corley went to Rhode Island Hospital to interview defendant.

Detective Corley testified at trial that, upon arriving at Rhode Island Hospital, both he and Providence Police Detective Maurice Green identified themselves to defendant in the emergency room and then interviewed him about the assault that he

---

4. The next day (August 27), Ms. Perry repeatedly tried to contact her mother by telephone. She first called at approximately 8 a.m., and she called several times thereafter during the course of the day—all to no avail.

5. According to defendant's medical records, he arrived at the Rhode Island Hospital emergency room at approximately 4:30 a.m. on August 27, and he told hospital personnel that he had suffered his injuries as the result of an assault.

alleged had been committed against him.[6] At that time, defendant gave a statement to the detectives about the alleged assault ("the hospital statement"). Detective Corley also testified that, while he was interviewing defendant at the hospital, he observed blood on defendant's hands and what "appeared to be bruises or cuts on his hands," but he also said that he "saw no injuries to his face or arms or his legs."[7]

Detective Corley further testified that defendant told the two detectives at the hospital that, between approximately 9 p.m. and 9:30 p.m. on the previous day (August 26), five or six people had attacked him near St. Joseph Hospital on Broad Street in Providence. The defendant stated that one of the people who had attacked him was one Levan Anderson, whom he characterized as being a former boyfriend of Ms. Brown. The defendant also told the detectives that he had gone directly to Rhode Island Hospital after the assault. Detective Corley testified that, by his estimate, it would probably take fifteen minutes or less for a person to walk the distance from the site of the alleged attack to Rhode Island Hospital.

Detective Patricia Cornell of the Providence Police Department Bureau of Criminal Identification testified that she was one of those who responded to the scene of the crime on Dodge Street on August 27. Detective Cornell said that she collected evidence from the scene, including the above-mentioned jacket cord and some blood-stained bed sheets. Detective Cornell further testified that she then went to Rhode Island Hospital, where she was informed that a bag "on the floor next to the nurse's station" contained the clothing that defendant had been wearing when he arrived at the emergency room. Detective Cornell testified that she introduced herself to defendant and, when defendant told her that he had been assaulted, she asked his permission to take his clothing and to take photographs. The defendant voluntarily agreed to her request. Once that process was completed, the police left the hospital, and defendant was free to leave.

Among the items that defendant allowed Detective Cornell to take from the hospital was a jacket and a set of keys. Detective Corley testified that on August 28 he examined the jacket and discovered that, at the neck of the jacket near its hood, there was a cord that looked similar to the one that had been found on the floor in Ms. Brown's apartment. He further testified that, although there was no cord at the base of the jacket, there were eyelets there, which suggested to him that at one time a cord had been threaded through the bottom of the jacket. Detective Corley further testified that he tested the keys that were found with defendant's clothing and discovered that one of the keys "opened up the bottom door of the [Dodge Street apartment] building" and another key "opened the * * * door" to Ms. Brown's apartment.

Detective Corley testified that it was at this point in the investigation that he decided to contact defendant so that he could question him about Mary Brown's death. When Detective Corley was unable to find defendant, he asked defendant's son to tell his father to contact the Providence Police Department.

---

6. Detective Corley testified that the detectives did not question defendant at the hospital about Ms. Brown's murder and that, in fact, they did not even inform him that she was dead.

7. Detective Corley testified that he was able to observe the condition of defendant's arms and legs because, at the time, defendant was on a hospital gurney dressed in a short-sleeved hospital "johnny."

Detective Corley testified that on the afternoon of September 2, 1999, defendant voluntarily came to the police station and told detectives that he wanted to talk to them about Mary Brown. The defendant was taken to an interview room, where he was given *Miranda* warnings [8] and was advised that he was a suspect in the investigation of Mary Brown's murder. The defendant waived his *Miranda* rights, and he then gave two statements to the police that were reduced to writing and signed by him ("the police station statements").[9]

The defendant's first police station statement on September 2 was consistent with his earlier hospital statement of August 27 with respect to his assertion that he did not return to Mary Brown's apartment after being spoken to by the reserve officers at the apartment building on the evening of August 26. In his second police station statement on September 2, however, defendant contradicted that assertion and admitted that he had, in fact, returned to Ms. Brown's apartment after being told by the reserve officers to leave the area. He also said that, while he was in Ms. Brown's bedroom after his return, she attacked him with a knife.

After defendant had given his two statements at the police station on September 2, Detective Corley sought and obtained a warrant for his arrest. On September 30, 1999, a search warrant was issued for the seizure of samples of defendant's blood and hair.

Almost one year later, on September 11, 2000, defendant was indicted by a grand jury for the murder of Mary Brown. Af-

ter the jury found him guilty of second-degree murder, the trial justice sentenced him to serve a term of life imprisonment. The defendant now appeals that conviction.

## Analysis

### I. Admission of Certain Evidence Obtained Pursuant to a Search Warrant

■ As indicated above, after defendant was indicted by the grand jury, the prosecution sought a search warrant to seize a sample of his blood so that it could conduct a deoxyribonucleic acid (DNA) analysis of that sample and then compare the results with the features of certain unidentified blood that had been discovered on bed sheets that were taken from the murder scene. On September 30, 1999, a District Court judge issued the search warrant pursuant to G.L.1956 § 12–5–2, as amended by P.L.1972, ch. 169, § 13.[10]

Before trial, defendant filed a motion *in limine*, which sought to prohibit the prosecution and its witnesses "from making any direct or indirect offer or reference to * * * evidence, testimony and/or laboratory results of any blood tests performed pursuant to the seizure of blood pursuant to a search warrant issued for defendant's blood." The trial justice denied defendant's motion *in limine*.

At trial, Robin Smith, a supervisor in the forensics biology laboratory at the Department of Health, testified that her laboratory performed DNA tests on a sample of defendant's blood and on samples from the unidentified blood stains that were on

---

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

9. The defendant does not challenge on appeal the admission into evidence of the two signed statements that he gave to the police on September 2.

10. At the time that the search warrant being challenged in this case was issued, G.L.1956 § 12–5–2, as amended by P.L.1972, ch. 169, § 13 (since amended by P.L.2004, chapters 441 and 493) provided, in pertinent part, for the issuance of a warrant "to search for and seize any property * * * [w]hich is evidence of the commission of a crime."

the bed sheets, and the laboratory determined that the blood samples were a match. Suzanne Ulery, an expert on DNA analysis from Bode Technology Group (a private DNA laboratory based in Springfield, Virginia) also testified that "the stain on the bed sheet matched that of the suspect Antonio Gomes."

The defendant asserts that the trial justice erred in denying his motion *in limine*, which sought to exclude any evidence that was based upon the seizure of his blood. He maintains that reversal of his conviction is required in light of this Court's decisions in *State v. DiStefano*, 764 A.2d 1156 (R.I.2000), and *State v. Dearmas*, 841 A.2d 659 (R.I.2004).

The central issue in *DiStefano* was whether law enforcement officers could obtain a search warrant to extract blood and urine samples from a driver who had refused to give consent in reliance upon G.L. 1956 § 31–27–2.1 (which statute is entitled "Refusal to submit to chemical test").[11] This Court, in a plurality opinion, noted that the only portion of § 12–5–2 (as it was worded at that time) that would be arguably relevant to the seizure of blood would be subsection "(4)," which authorized the seizure of "property" that is "evidence of the commission of a crime." *DiStefano*, 764 A.2d at 1167. The plurality stated that it was "not satisfied that one's bodily fluid is 'property' or evidence of the commission of a crime," because, in the plurality's view, "it is not the blood itself that is the 'evidence of the commission of a crime,'

but rather the test results that are relevant in a criminal trial." *Id.*

Some four years later, in *Dearmas*, this Court was faced with a challenge to the legality of a Superior Court blood seizure order and subsequent search warrant. The issue in that case was whether the Superior Court exceeded its jurisdiction under § 12–5–2 when it issued a blood seizure order and authorized the prosecution to apply for a search warrant to effectuate the order, and then issued a search warrant for the police to seize a vial of the accused's blood. *Dearmas*, 841 A.2d at 661.

We acknowledged in *Dearmas*, 841 A.2d at 662, that the justices of the Superior Court and of the District Court are vested with the authority to issue search warrants by virtue of the provisions of G.L.1956 § 8–3–6 and § 12–5–1(a). However, we went on in *Dearmas* to hold that "the plain and ordinary understanding of the word 'property' excludes blood samples, forcibly taken from living human beings, from the ambit of that term as it is used in § 12–5–2." *Dearmas*, 841 A.2d at 663. We also held that "the word 'property' in § 12–5–2 does not include blood samples seized involuntarily from criminal defendants or suspects." *Dearmas*, 841 A.2d at 668. We further held in *Dearmas* that "given the property-seizure limitation on the issuance of warrants under § 12–5–2, * * * the Superior Court lacked the authority to issue blood-seizure orders such as the one that the court issued in this case, authorizing the state to apply for a search warrant to seize a sample of the petitioner's blood." *Dearmas*, 841 A.2d at 668.[12]

**11.** In *DiStefano*, 764 A.2d at 1158, this Court addressed three certified questions relating to the validity of a search warrant which had authorized the seizure of samples of the blood and urine of the defendant in that case (who was charged with driving under the influence, death resulting).

**12.** It should be noted that, subsequent to the issuance of our opinion in *Dearmas* and subsequent to the events that gave rise to the case at bar, the General Assembly amended § 12–5–2, adding a new sub-section to the statute. That new sub-section provides for the issuance of warrants permitting the authorities to search for and to seize:

In light of our opinions in *DiStefano* and in *Dearmas*, it is our view that the District Court in issuing the instant search warrant authorizing the seizure of samples of defendant's blood exceeded its authority under the statute as it was worded at that time. It follows that, because they were derived from tests of those blood samples, the DNA results and the conclusions drawn from them should not have been admitted into evidence at defendant's trial.

■ However, in spite of our determination that the search warrant was improperly issued and that the evidence derived from that search warrant was inadmissible, it is nonetheless our opinion that the admission of the challenged DNA evidence constituted harmless error beyond a reasonable doubt—in view of the other independent and overwhelming evidence of defendant's guilt. *See State v. Robertson*, 740 A.2d 330, 337 (R.I.1999) ("[T]he admission of impermissible evidence need not be prejudicial in a case in which there is independent overwhelming evidence of a defendant's guilt."); *see also State v. Gomes*, 764 A.2d 125, 137 (R.I.2001).[13]

Of particular significance as evidence of defendant's guilt were his own inconsistent statements that he gave to the police de-tectives who were assigned to investigate Ms. Brown's murder. In his very first statement (the hospital statement), defendant told the detectives on August 27 that, between approximately 9 and 9:30 p.m. the previous evening, he had been attacked near St. Joseph Hospital by five or six people, one of whom he identified by name and characterized as a former boyfriend of Ms. Brown. He added that he then went directly from the location of the alleged attack to Rhode Island Hospital.

In contrast, Detective Corley testified that, by his estimate, it would take only approximately fifteen minutes for a person to walk the distance between the site of the alleged attack (near St. Joseph Hospital) and Rhode Island Hospital. He then noted that defendant's medical records indicated that he had arrived at the emergency room at Rhode Island Hospital at approximately 4:30 a.m. on August 27— that is, *several hours* after the alleged attack near St. Joseph Hospital.

Detective Corley further testified that, when defendant was interviewed by the detectives at Rhode Island Hospital on August 27, he admitted to having been in an argument with Ms. Brown on the previous day. Detective Corley further testi-

"Samples of blood, saliva, hair, bodily tissues, bodily fluids, or dental impressions from the body of a person, that may yield evidence of the identity of the perpetrator of a crime when subjected to scientific or other forensic analysis. The foregoing samples, and the results of any scientific or other forensic analysis, shall be admissible in all criminal proceedings, subject to application of the rules of evidence and criminal procedure. When any of the foregoing samples are seized for scientific or forensic analysis, the seizure shall be conducted in accordance with the regulations, guidelines, or protocols of the department of health or the state crime laboratory, as may be appropriate under the circumstances." Section 12–5–2(5), as amended by P.L.2004, ch. 441, § 1, and ch. 493, § 1.

The amendment, however, is not retroactive; therefore, it is not applicable to this appeal.

13. The state argues that we should adopt and apply to this case the "good faith" exception that the United States Supreme Court recognized with respect to federal prosecutions in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In light of our holding that the admission of the contested evidence was harmless error, we need not reach that argument in this case. *See also State v. Nunez*, 634 A.2d 1167, 1171 (R.I. 1993) ("At this time we decline to consider whether we shall adopt the 'good faith exception' rule propounded in *United States v. Leon* * * *.").

fied that defendant also told him at the hospital that he never saw Ms. Brown again after the police had allowed him to remove some of his clothing from her apartment and to leave the area on August 26.

In his next statement to the police (the first police station statement), which he made on September 2, defendant stated:[14]

"When I was near St. Joseph's Hospital I got jumped by six black guys, I tried to fight back but I couldn't whip [h]im. I think one of them was Mary Brown['s] old boyfriend Levan. They kept saying 'mess the pretty boy['s] face' and 'woman stealer.' After they jumped me I walked to RI Hospital to get treated."[15]

In the same first police station statement, defendant again denied that he ever went back to Ms. Brown's apartment after the reserve officers told him to leave on August 26. And, when asked whether he had keys to Ms. Brown's apartment, defendant replied: "The police took them and gave them to Mary." Later in the same statement, defendant positively identified the items that he had allowed the detectives to remove from the hospital. Included among those items was defendant's clothing and a set of keys that he said was the same set he had given to the police on August 26.

The following dialogue between a police officer and defendant also constituted part of the first police station statement:

"Q. How did you get these keys back from Mary?

"A. When the police officer made me give these keys back to Mary she gave them back to me when the officer wasn't looking.

"Q. Why would Mary Brown give you the keys back when she ask[ed] the police to get the keys from you in the first place so that you wouldn't come back into her apartment?

"A. Mary has a split personality when she drinks and when she gave me the keys she told me to come back later."

In the same statement, defendant was asked directly whether he had killed Mary Brown. He responded: "No, I didn't, I loved her very much, I couldn't hurt anyone, I'm a pussy cat."

As indicated earlier in this opinion, defendant voluntarily gave Detective Patricia Cornell permission to remove from Rhode Island Hospital a bag that contained the clothing that he had been wearing when he arrived at the hospital. In his first police station statement, the defendant identified the clothing that had been removed from the hospital as the same clothing that he had been wearing when he left Ms. Brown's apartment on August 26. Among the items that he identified as being his were a jacket and a pair of blue jeans. The defendant was then asked by the police (as is noted in the first police station statement): "Was there a drawstring on the hood [of the jacket]?" To that question, defendant replied: "Yes, and there was one on the waist too."

In his second police station statement on September 2, defendant informed the police that he was beginning to remember additional events that had occurred in the

---

14. The defendant's two police station statements on September 2 were signed by him after he had been advised of his *Miranda* rights.

15. It should also be recalled that, in spite of defendant's claims about allegedly having been attacked in the evening of August 26, Detective Corley testified at trial that he did not observe any injuries on defendant's face, legs or arms when he interviewed him at Rhode Island Hospital on August 27.

time frame that began when he was told by police to leave Ms. Brown's apartment on the evening of August 26. In that second statement, defendant admitted for the first time that he actually had returned to Ms. Brown's apartment after his initial departure. He then described a violent altercation that occurred between himself and Ms. Brown after his return. Specifically, he stated:

"[N]ow I remember that * * * I then went to Mary's house. I rang the buzzer and she buzzed me in. I went upto the apartment and I used the knocker and she let me in. Mary was still upset. I'm pretty sure that Mary made me something to eat and then we went to bed. We both took off our clothes. She started to flip out and she grabbed me by the neck. Mary went to the kitchen and when she came back into the bedroom she grabbed me by the neck again. I got off the bed and stood up and then she swung a knife at me and cut my right hand (index finger and the middle finger) and my left wrist. I must have took the knife off of her or else I would have been dead. I don't remember getting dressed and I don't remember leaving her apartment. The next thing I know is getting beat up on Broad St. I walked to the Rhode Island Hospital." [16]

Apart from the inconsistencies that are so striking in defendant's various statements to the police, the record contains a considerable amount of additional evidence that is further indicative of defendant's guilt.

At the police station, defendant was asked to identify the clothing that he had had been wearing when he arrived at Rhode Island Hospital early in the morning of August 27. Among the clothing that defendant identified in both his first and second police station statements was a drawstring/windbreaker jacket. At the police station, he informed the police that he had been wearing that jacket when he left Ms. Brown's apartment. Detective Corley testified that, when he investigated the Dodge Street crime scene on August 27, he observed what appeared to be a cord from a jacket lying on the floor near where Ms. Brown's body had been found. He further testified that the cord was taken into evidence. When asked at trial if the injuries on Ms. Brown's neck were consistent with the cord that had been found at the scene, Dr. Sikirica (the medical examiner who performed the autopsy on Ms. Brown) answered the question in the affirmative.

Dennis Hilliard, the director of the State Crime Laboratory, who has special expertise in the area of hair and fiber analysis, testified at trial. Mr. Hilliard testified that he removed and examined several hair-like fibers that were attached to the cord and that the fibers were human head hairs. He further testified that a microscopic comparison between those hairs and ones taken from Ms. Brown revealed that the samples "were consistent" with each other and "could have originated from the same source."

Mr. Hilliard then testified that he compared the construction of a piece of cord taken from the scene of the crime with a piece of cord taken from the hood of a

---

16. In addition, the second police station statement contains the following dialogue between one of the police officers and defendant:

"Q. Mr. Gomes, is this the jacket that you were wearing when you left Mary Brown's apartment that afternoon?

"A. Yes it is.

"Q. Mr. Gomes, did you kill Mary Brown?

"A. I don't believe that I killed her if I did I had to be out of my mind. I loved her too much."

jacket,[17] and that the cords "matched each other in component structure." He further testified that the "two cords were similar and could have originated from the same manufacturer and could have both [come] from—originated from the same jacket."

When defendant arrived at the Rhode Island Hospital emergency room early on August 27, he was wearing a pair of blue jeans. In his first police station statement, he identified those jeans as being the same pair that he had been wearing when he left Ms. Brown's apartment on the evening of August 26. The front part of the blue jeans was noticeably stained with what appeared to be blood. Robin Smith of the Department of Health and Suzanne Ulery of Bode Technology Group both testified that they tested samples of these stains and determined that, in fact, the stains were caused by blood. Ms. Smith and Ms. Ulery also testified that they performed a DNA analysis on a sample of blood taken from Ms. Brown as well as on the samples taken from the blue jeans and then compared the results from these separate DNA tests. Ms. Smith and Ms. Ulery then testified that, to a very high degree of certainty, the DNA contained in the blood found on defendant's blue jeans matched the DNA found in Ms. Brown's blood.

In light of all of the overwhelming and independent evidence of defendant's guilt, the erroneous admission of the evidence that was based upon the seizure of his blood was harmless beyond a reasonable doubt.

In view of our decision with respect to this aspect of this case, we need not formally address the question of whether, by filing a motion *in limine* but no motion to suppress, defendant properly preserved for appellate review the issue of the seizure of his blood. We would indicate, however, that it is our view that the vehicle for seeking to exclude allegedly improperly obtained evidence (or the fruits thereof) should ordinarily be a motion to suppress. *See DiStefano*, 764 A.2d at 1158 (noting that the defendant in that case had "filed a motion to suppress the introduction of the test results on the ground that her blood was drawn without her consent").

Furthermore, we shall refrain from ruling on whether this search and seizure issue may have been waived because defense counsel did not renew his *in limine* objection to the admission of the contested evidence during the trial itself. We wish to indicate, however, that our preliminary view of that issue is that, except when the *in limine* ruling is clearly *definitive*, it would at the very least be prudent for counsel to articulate the objection once again in the vital context of the trial itself. *See State v. Torres*, 787 A.2d 1214, 1220 (R.I.2002) ("The preliminary grant or denial of an *in limine* motion 'need not be taken as a final determination of the admissibility of the evidence referred to in the motion.' ") (quoting *State v. Fernandes*, 526 A.2d 495, 500 (R.I.1987)); *State v. Bennett*, 122 R.I. 276, 286, 405 A.2d 1181, 1186–87 (1979).[18]

---

17. The record reveals that Mr. Hilliard examined the same jacket that defendant admitted to police he had been wearing when he left Ms. Brown's apartment and when he arrived at the Rhode Island Hospital emergency room.

18. In connection with the issue of *in limine* motions, it is interesting to note that Rule 103(a) of the Federal Rules of Evidence was amended (effective December 1, 2000) to add the following language: "Once the court makes *a definitive ruling* on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." (Emphasis added.) The Advisory Committee Notes to that December 1, 2000

## II. The Hearsay Statements

The defendant asserts that the trial justice erred in ruling against the admissibility of certain hearsay statements that he alleges were crucial to his defense.

The first hearsay statement that he maintains was erroneously kept from the jury's consideration was made by Mary Brown and is reflected in a Providence police report dated August 2, 1999.[19] The other hearsay statements that defendant contends were erroneously kept from the jury was a statement that he made to Reserve Officer Waleryszak outside Ms. Brown's apartment building on August 26.

■ The admissibility of evidence pursuant to an exception to the hearsay rule is a question that is addressed to the sound discretion of the trial justice, and a ruling in that respect will not be disturbed on appeal unless it is clearly erroneous. *State v. Lynch*, 854 A.2d 1022, 1038 (R.I. 2004) ("The admission of a statement under an exception to the hearsay rule is within the sound discretion of the trial justice and shall not be overturned unless clearly erroneous."); *see also State v. Crowhurst*, 470 A.2d 1138, 1145 (R.I.1984).

### A. Providence Police Report of August 2, 1999

■ Before defendant's criminal trial began, defense counsel filed a "Notice to Introduce Statement under Rule 803(24) of [the] Rhode Island Rules of Evidence."[20] The statement referred to in that Rule 803(24) notice was reflected in a Providence police report dated August 2, 1999 and had been made by the complainant, Mary Brown. According to the police report, Ms. Brown told the police that she had received numerous threatening and harassing telephone calls from "a subject that she knows as Lavaughn [*sic*] Anderson * * *."[21]

The prosecution reacted to defense counsel's Rule 803(24) notice by filing a motion *in limine* seeking to preclude the defense from introducing the August 2 police report into evidence. The prosecution's motion *in limine* further sought to "preclude cross-examination" of Mr. Anderson about the police report. The motion also requested that the investigating officers who were named in the report "be prohibited from testifying to same."

---

amendment make the following cautionary observation: "The amendment imposes the obligation on counsel to clarify whether an *in limine* or other evidentiary ruling is definitive when there is doubt on that point."

19. The statement of August 2, 1999 that is at issue here is not to be confused with defendant's own statements to the police later that month, after Mary Brown had been killed.

20. Rule 803(24) of the Rhode Island Rules of Evidence—the so-called "catchall" exception to the hearsay evidence rule—provides:

"*Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B)

the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his or her intention to offer the statement and the particulars of it, including the name and address of the declarant."

21. Mr. Anderson was neither arrested nor charged with any crime based upon the allegations contained in the August 2 police report.

In support of its motion *in limine*, the prosecution maintained (1) that Ms. Brown's statement constituted irrelevant and impermissible hearsay and (2) that its introduction would confuse the jurors by causing them to speculate on collateral matters.

After hearing and considering the arguments of counsel, the trial justice granted the prosecution's motion *in limine* which sought to exclude both the August 2 police report and any other evidence relating to that report. In so ruling, the trial justice found that Ms. Brown's statement in the police report constituted inadmissible hearsay. He further found that the length of time between the date that Ms. Brown filed her complaint against Mr. Anderson (August 2) and the date that the murder took place (August 26–27) was of a sufficient duration to justify exclusion of the police report.

■ In his brief to this Court, defendant alleges that the statement of Ms. Brown was crucial to his defense because it supported what he characterized as his "third party perpetrator defense." Specifically, defendant asserts that, by completely excluding all of the evidence that was critical to his third-party perpetrator defense, the trial justice violated his constitu-

tional right to present a full and fair defense, his right to due process of law, and his right to a fundamentally fair trial.[22] The defendant further asserts that the statement was necessary "to illustrate the bias the police may have harbored toward [defendant] in pursuing him so singlemindedly."[23]

■ It has often been recognized that a motion *in limine* can sometimes be a beneficial mechanism that can be used to prevent unfairly prejudicial evidence from having an impact on the jury and to avoid wasting unnecessary time during the trial. *State v. Martinez*, 824 A.2d 443, 448 (R.I. 2003) (recognizing that the *in limine* motion "has become widely recognized as a salutary device to avoid the impact of unfairly prejudicial evidence upon the jury and to save a significant amount of time at the trial") (quoting *State v. Torres*, 787 A.2d 1214, 1219–20 (R.I.2002)); *see also Ferguson v. Marshall Contractors, Inc.*, 745 A.2d 147, 150 (R.I.2000). The rationale behind such a motion is to prevent prejudicial evidence from being presented to a jury before the trial court has had the opportunity to rule upon its admissibility in the context of a particular trial. *Martinez*, 824 A.2d at 448 ("Its purpose 'is to prevent the proponent of potentially preju-

---

22. In what he entitled "Notice to Introduce Statement," defendant sought admission of the August 2 police report under Rule 803(24). Although defendant has not specifically alluded to that rule in briefing and arguing this portion of his appeal, we have chosen to put substance over form and to address the argument that he made in that regard in the trial court.

To the extent that defendant seeks for the first time on appeal to expand his argument about the August 2 police report into a broader constitutional argument, however, we consider such belated contentions to be inconsistent with our "raise or waive" rule. *See generally Pollard v. Acer Group*, 870 A.2d 429, 432 n. 10 (R.I.2005).

23. The defendant also contends, for the first time, that Mary Brown's statement in the police report was admissible under Rule 804(c) of the Rhode Island Rules of Evidence. (Rule 804(c) deals with the admissibility of declarations of deceased persons.) Because this contention was not raised at the trial level and because it does not meet the criteria for invoking the narrow exception to our "raise or waive" rule, we deem this contention to have been waived. *See State v. Ibrahim*, 862 A.2d 787, 795 (R.I.2004); *State v. Grant*, 840 A.2d 541, 546 n. 1 (R.I.2004); *State v. Burke*, 522 A.2d 725, 731 (R.I.1987).

dicial matter from displaying it to the jury * * * in any manner until the trial court has ruled upon its admissibility in the context of the trial itself.' ") (quoting *Torres,* 787 A.2d at 1220 and *State v. Fernandes,* 526 A.2d 495, 500 (R.I.1987)).

■ When reviewing the grant or denial of a motion *in limine,* this Court will consider only whether the challenged evidence was proper and admissible and, if not, whether there was sufficient prejudice to constitute reversible error. *Fernandes,* 526 A.2d at 500 ("The only consideration on appeal is 'whether the evidence and cross-examination was proper and admissible, and if not, whether the error was sufficiently prejudicial to warrant reversal.'") (quoting *Gilliam v. State,* 270 Ind. 71, 383 N.E.2d 297, 301 (1978)); *see also Martinez,* 824 A.2d at 448; *Torres,* 787 A.2d at 1220.

In view of these principles, we must determine whether Mary Brown's statement in the August 2 police report and also the circumstances surrounding the giving of that statement were properly admissible at defendant's criminal trial. If the evidence was properly admissible, then a determination must be made as to whether the trial court's granting of the prosecution's motion *in limine* (which resulted in the exclusion of that evidence) constituted a sufficiently prejudicial error requiring reversal of the case.

■ There is no question that a defendant is entitled to present a defense that implicates another person. *See State v. Wright,* 817 A.2d 600, 609 (R.I.2003) ("It goes without saying that an appropriate defense to a charge of criminal misconduct is that another person was the true perpetrator of the crime."). To preserve such a defense, however, a defendant must make an offer of proof. *See State v. Gazerro,* 420 A.2d 816, 824–25 (R.I.1980). Moreover, we require that such an offer of proof

be reasonably specific. We made the following clear statement in *Gazerro* about what is required in this regard:

"To be admissible, evidence of another person's motive to commit the crime with which a defendant is charged must be introduced in conjunction with other evidence tending to show the third person's opportunity to commit the crime and a proximate connection between that person and the actual commission of the crime." *Id.* at 825.

In making his offer of proof at the hearing on the prosecution's motion *in limine* in this case, defense counsel pointed to the fact that there were no witnesses to Ms. Brown's murder. He then asserted that, despite the fact that the police knew about the August 2 complaint that Ms. Brown had filed against Mr. Anderson (her former boyfriend), the police had focused exclusively on defendant as their only suspect in the investigation of Ms. Brown's murder. Defense counsel then maintained that the lack of witnesses, combined with the existence of the August 2 police report, should have prompted the investigating police officers to focus on Mr. Anderson as the primary suspect, and he contends that he was entitled to present evidence to the jury concerning what he alleges was the bias of the police against defendant.

The record reveals that defense counsel offered absolutely no evidence tending to show, or even to suggest, that Mr. Anderson had murdered Ms. Brown or that he was ever in the vicinity of the murder scene on August 26 or 27. *See Wright,* 817 A.2d at 610 (holding that the defendant had "failed to make an offer of proof and failed to introduce any evidence tending to show that * * * [the alleged third-party perpetrator] could have committed the murder"); *State v. Brennan,* 526 A.2d 483, 488 (R.I.1987) (holding that

the defendant "failed to make an offer of proof or to introduce any evidence tending to show that * * * [the alleged third-party perpetrator] could have committed the murder"); *Gazerro*, 420 A.2d at 825 ("[T]he offer of proof shows that defendants would have introduced absolutely no evidence placing * * * [the alleged third-party perpetrator] on February 3 in the vicinity of the spot where * * * [the victim] was found.").

It is our judgment that defense counsel's offer of proof was inadequate and that the admission of the August 2 police report and any evidence related to that report would have constituted "an impermissible invitation to the jury to speculate on a collateral matter." *Gazerro*, 420 A.2d at 825; *see also Wright*, 817 A.2d at 610 ("[E]vidence of a third person's potential motive or opportunity to commit the crime must not lead to jury speculation nor improperly open up collateral matters.").

Accordingly, it is our view that the trial justice did not err in granting the prosecution's motion *in limine* to preclude the admission of the contested evidence.

### B. The Statement Defendant Made to Reserve Officer Waleryszak

■ Finally, defendant contends that a statement that he made to Reserve Officer Waleryszak was erroneously kept from the jury. Specifically, he maintains that the trial justice erred in preventing him from soliciting testimony from Reserve Officer Waleryszak about a statement that he (defendant) made to the officer outside Ms. Brown's apartment building on the evening of August 26.[24]

On direct examination, defense counsel asked Reserve Officer Waleryszak whether defendant had "mentioned to [the officer] that he was just trying to keep [Mary Brown] from drinking * * *?" The prosecutor objected to this question, and the objection was sustained. Shortly thereafter, defense counsel asked Reserve Officer Waleryszak whether defendant had "mention[ed] anything to [the officer] about [Mary Brown's] drinking?" The prosecutor again objected, and the objection was again sustained.

The trial justice then conducted a sidebar conference about the admissibility of this line of questioning. During the sidebar conference, defense counsel asserted that defendant's statement to Reserve Officer Waleryszak was "admissible to explain his own actions." The prosecutor disagreed, arguing that the statement constituted hearsay and that "[t]he defendant cannot introduce any self-serving statement through police officers * * *."[25] After hearing these arguments, the trial justice ruled as follows: "If you want [defendant] to say that put him on the stand. You can't get a statement through a self-serving statement."

---

24. Reserve Officer Waleryszak was called by the defense to testify.

25. The prosecutor cited *State v. Harnois*, 638 A.2d 532 (R.I.1994) to support his argument. In *Harnois*, we unequivocally rejected an argument made by the defendant in that case that is similar to the argument now before us:

    "The defendant did not take the stand at trial. He may not testify by other means, including by way of the unsworn statements made to police. * * * By choosing to exercise his Fifth Amendment right, defendant waived all rights to testify. To admit defendant's statements under either [Rule 803(24) or Rule 801(d)(2)(B) of the Rules of Evidence] would be to ignore the rules' well-established and unambiguous guidelines. The defendant was seeking to offer testimony through his statements, which might raise reasonable doubt in the minds of a jury, yet would deprive the state of the opportunity of cross-examination. The rules of evidence will not be manipulated in this way." *Harnois*, 638 A.2d at 535–36.

The defendant now asserts that the statement that he made to Reserve Officer Waleryszak was admissible pursuant to Rule 803(2) and Rule 803(3).[26] The defendant did not, however, cite these rules as a basis for his argument in favor of admissibility during his criminal trial. As a result, he has not preserved this issue for appellate review. *See, e.g., Union Station Associates v. Rossi,* 862 A.2d 185, 192 (R.I.2004) ("[A]ssignments of error must be set forth with sufficient particularity to call the trial justice's attention to the basis of the objection."); *State v. Grant,* 840 A.2d 541, 546 (R.I.2004) ("It is not the practice of this Court to review issues that are raised for the first time on appeal. According to our well settled 'raise or waive rule,' a litigant must make a timely and appropriate objection during the lower court proceedings before this Court will indulge the issue on appeal."); *see State v. Saluter,* 715 A.2d 1250, 1258 (R.I.1998) ("It is axiomatic that 'this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court.'") (quoting *State v. Gatone,* 698 A.2d 230, 242 (R.I.1997)); *State v. Donato,* 592 A.2d 140, 141 (R.I. 1991) ("As established by this court, an issue that has not been raised and articulated previously at trial is not properly preserved for appellate review."); *see also United States v. Pugliese,* 712 F.2d 1574, 1580 (2d Cir.1983) ("Unless the basis for proposed admission is obvious, it is the burden of counsel who seeks admission to alert the court to the legal basis for his proffer.").[27]

## Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed. The record shall be remanded to the Superior Court.

26. Rule 803 provides in pertinent part:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \*

(2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

(3) *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

27. Although we have recognized a narrow exception to the "raise or waive" rule when basic constitutional rights are concerned, in such instances the alleged error must be more than harmless, the record must be sufficiently developed to permit review of the issue and the failure to raise the issue must be "based upon a novel rule of law of which counsel could not reasonably have known at the time of trial." *Burke,* 522 A.2d at 731; *see also Pollard,* 870 A.2d at 432 n. 10. The defendant in this case has failed to meet the requirements necessary to invoke the narrow exception to our "raise or waive" rule.