STATE

v.

Timothy SCANLON.

No. 2007–330–C.A.

Supreme Court of Rhode Island.

Nov. 17, 2009.

Jane M. McSoley, Department of Attorney General, for Plaintiff.

Marie T. Roebuck, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice FLAHERTY, for the Court.

### I

Sometime after midnight on March 2, 2003, Janet S.[1] left Buddy's, a bar in Woonsocket. Janet, an admitted drug addict and prostitute, had spent most of the previous afternoon and evening consuming drugs, including cocaine, as well as a prodigious amount of alcohol.[2] She was, in her own words, "wasted" and having trouble walking. Despite her condition, Janet was on her way home to meet one of her drug suppliers, from whom she intended to procure a "seventy piece," an amount of cocaine that costs $70.[3]

As Janet made her way along Arnold Street, a vehicle, possibly a Jeep Cherokee or a Ford Bronco, slowed to the curb and a man asked her if she "wanted to party." Janet understood that to mean that she would have sex with the man for money, or use drugs with him, or both, and so she got into the truck. Once inside, she and the driver quickly agreed that she would provide him with sexual services in exchange for $40. Although she did not initially recognize the driver, Janet later remembered that about two months before March 2, 2003, she had been hired for sex by the same man in exchange for $40. Also, Janet remembered that although the driver drove the same truck on that earlier occasion, she said the vehicle's color had been changed. She was, however, unable to recall whether the vehicle was red or gray on March 2, 2003. After Janet got into the vehicle, the driver proceeded to the Sovereign Bank on Social Street in Woonsocket where he withdrew $100 from the automatic teller machine (ATM).

Once the couple left the Sovereign Bank, however, Janet's fortunes took a decided turn for the worse. Because she suddenly felt "weird" and desired to just go home, Janet asked the driver to drive her to her home rather than party. She directed the driver to take a left toward Providence Street. Instead, however, the driver took a sharp right toward Blackstone Street, and he suddenly became enraged at Janet. Just as suddenly, the driver began to stab Janet with a screwdriver in the head, face, and neck. As he assaulted her, the driver pressed Janet's head to the seat and yelled at her to "shut up you whore you," also calling her a "no good crack head whore."

Eventually the assailant brought the truck to a stop among several abandoned mills in northwestern Woonsocket. He continued to persistently prod the screwdriver into Janet's head, face, and neck—which were now bleeding profusely—and he ordered her to remove the money from her pocket. Janet complied. Next, the driver ordered Janet to remove her cloth-

---

1. We identify the complaining witness by pseudonym to protect her privacy.

2. In addition to the alcohol she consumed during the day, Janet testified that she drank three or four pitchers of beer at Buddy's over a four-to-five hour period.

3. Besides using alcohol and illicit drugs, Janet testified that she ingested an impressive array of prescription drugs, including: Depro, Catrinal, Stellco, Zoloft, Lipitor, Morpass, Puridipass, Lantiss, and Flexor; she did not specify the dosages. Doctor Daniel Asiedu's medical record of his physical examination of Janet on, March 2, 2003, lists her medications as Effexor, Seroquel, Cardizem, Paxil, and nitroglycerin; all with unknown doses.

ing. She took everything off except her socks.

The driver penetrated Janet digitally, all the while berating and threatening her. Eventually the driver ceased these actions, reached across Janet to open the passenger's door, and then literally kicked her out of the truck into the cold, snowy March night, wearing nothing but her socks.

Unfortunately, this was not the end of Janet's troubles that night because the driver followed her out of the truck. Although she struggled to resist her assailant, the man threw Janet down on the ground and sexually assaulted her again. Then, the assailant dragged her over to the truck and forced Janet to get on her knees in the snow and perform oral sex on him. Throughout this entire encounter, the driver continued to punch Janet with his fists. He also pulled the hair out of her scalp, and repeatedly stabbed her with the screwdriver. Finally, the attacker grabbed her right arm, yanking it back with enough force so that she could feel her shoulder snap.

The assailant turned a deaf ear to Janet's pleas to return at least some of her clothes as a protection against the cold and snow. After threatening to kill her if she talked to the police, he left the scene. Janet crawled into the middle of the road, where a passing motorist saw her and called the police. Officer George McMann of the Woonsocket Police Department arrived in the mill area between 2 a.m. and 2:20 a.m. to find Janet bleeding and sitting naked in the middle of Singleton Street. Janet told the officer that she had been raped and battered.

Janet was taken by rescue to Landmark Medical Center emergency room. Daniel Asiedu, M.D., conducted a physical examination of Janet on March 2, 2003. He noted that Janet had "bruises and bleeding on the center of her scalp" and "lacerations and marks on her right cheek and her right side of her neck," along with bruising of her knees and shins. The doctor's examination also revealed that her right arm was dislocated from her shoulder, requiring pain medication and the use of a sling.

Although she initially was reluctant to do so, Janet made a statement to police shortly after she arrived at the hospital. In her statement, Janet said the driver sexually assaulted her by forcing her to perform oral sex and by forcibly penetrating her digitally. Significantly, however, she said she never had vaginal intercourse with her assailant.[4]

As to the identity of her assailant, on March 2, 2003, Janet told the officers that the driver was a blond white male. Initially, she did not remember that the driver had stopped at the Sovereign Bank ATM on Social Street. When the officers suggested the driver could be a John T.,[5] Janet responded affirmatively that he was the one who committed the sexual assaults against her. In her later testimony, Janet admitted that she first told the officers that John had assaulted her because she thought it was he, and that she "just wanted it over." But, when the officers later showed Janet a photo array containing John's photograph, Janet did not identify him. Instead, she told the officers that she had been attacked by a younger, heavier man who did not wear glasses.

---

4. According to Dr. Asiedu's record of examination of Janet, her account of the assault differed somewhat from her initial statement to the police. According to his record, Janet performed oral sex on her attacker in exchange for money. Then, the man became violent after he demanded vaginal intercourse and she refused. She said that the driver responded by stabbing her with the screwdriver.

5. We also identify this individual by pseudonym to protect his privacy.

It was not until April 2003 that Janet remembered that her attacker had stopped at the Sovereign Bank on Social Street and that he had withdrawn $100. She then realized that the bank surveillance camera may have photographed him as he withdrew his money. She notified the police, who quickly learned that a withdrawal had been made at 12:55 a.m. on March 2, 2003, from the Sovereign Bank ATM from an account linked to defendant, Timothy Scanlon. A photo of the individual making the withdrawal was obtained and that photograph was included in a new photo array shown to Janet. After reviewing the array, Janet instantly picked out defendant, Timothy Scanlon, as the man who sexually assaulted her.

On April 15, 2003, Mr. Scanlon was arrested. He spoke with police, and denied that he attacked Janet. The defendant volunteered to provide a sample of his DNA; a later analysis proved that his DNA matched that extracted from Janet by anal and vaginal swabs.

Further investigation by the police revealed that on April 10, 2003, Mr. Scanlon sold a 1988 GMC Jimmy to Dennis Fleurant of Privilege Auto Parts in Woonsocket for use as scrap metal. Mr. Fleurant described the vehicle as gray or silver, with some blue. When the police seized the 1988 GMC Jimmy, however, it was determined that the vehicle's original paint color had been red (because the door jams and the hood's interior were red), but that the truck had been repainted gray or silver.

In April or May 2003 Lieutenant Timothy Paul, who then worked for the Woonsocket Bureau of Criminal Investigations, conducted a forensic analysis of the vehicle. Lieutenant Paul took photographs and administered a "luminol test" of the vehicle's interior.[6] The results of the luminol testing were negative; no traces of blood were found in the vehicle.

A grand jury returned a ten-count indictment against Timothy Scanlon.[7] Counts 1, 2, and 3 alleged that Timothy Scanlon violated G.L. 1956 §§ 11–37–2 and 11–37–3 by committing first-degree sexual assault against Janet. Count 4 alleged that Timothy Scanlon committed first degree robbery against Janet in violation of G.L. 1956 § 11–39–1(a). Count 5 charged Timothy Scanlon with assaulting Janet with a dangerous weapon in violation of G.L. 1956 § 11–5–2. Count 6 alleged that Timothy Scanlon committed an assault and battery on Janet that resulted in serious bodily injury, also in violation of § 11–5–2.

At trial the state offered testimony from Janet, Officer George McMann, Lt. Timothy Paul, Det. Todd Fernandes, salvage yard owner Dennis Fleurant, and Sharon Elizabeth Mallard, an analyst with the Rhode Island Department of Health. The defense offered testimony from Dr. Daniel Asiedu, Gale Lescarbeau (defendant's mother), Roxanne Pare (the mother of defendant's two children),[8] and Charlotte Ho-

---

6. Luminol is a substance that reacts to the chemicals in blood. If there is blood on the tested surface, such as the vehicle's interior, the luminol will appear fluorescent and glow in total darkness. If there is no blood on the tested surface, the luminol will not glow.

7. Counts 7, 8, 9, and 10 alleged the kidnapping and assault with a dangerous weapon on a separate victim. The Attorney General dismissed counts 7 through 10 based on Rule 48(a) of the Superior Court Rules of Criminal Procedure. A different person confessed to committing these offenses.

8. Ms. Pare testified that defendant called her at 1:20 a.m. on March 2, 2003, and then came over to her home in Woonsocket shortly afterward. She also testified that defendant admitted to her, after his arrest for the sexual assaults on Janet, that he had a sexual encounter with Janet on March 2, 2003, but that he denied that he sexually assaulted her.

pejoy Danis (a nurse at Landmark Medical Center). The trial justice granted the state's motion *in limine* to exclude the testimony of proposed defense witness Richard Miles, Janet's boyfriend at the time the crimes were committed.

On July 28, 2005, a jury found Timothy Scanlon guilty on all remaining counts of the indictment that had been submitted to them. On September 28, 2005, the trial justice denied defendant's motion for a new trial. On November 25, 2005, the trial justice sentenced Timothy Scanlon to serve fifty years concurrently on counts 1, 2, 3, and 4 and a suspended sentence of twenty years with twenty years probation on counts 5 and 6, to be served consecutively to counts 1, 2, 3, and 4. The defendant timely appealed to this Court.

On appeal, defendant asserts first, that the trial justice committed reversible error when he granted the prosecution's motion *in limine* to exclude the testimony of Richard Miles. Second, defendant says that he was entitled to judgment of acquittal on count 6, felony assault. Third, defendant argues that he cannot be convicted on both counts 5 and 6, because these counts merged into a single count under double-jeopardy principles, and the trial justice erred in ruling otherwise. Fourth, defendant maintains that he is entitled to a new trial because the late disclosure of evidence by the prosecution constituted a violation of his due-process rights. We affirm the judgments of conviction.

## II

### A

### Exclusion of Richard Miles's Testimony

When she was cross-examined after being offered as a witness by the state, Janet testified that she spent the afternoon preceding her attack ingesting cocaine with her boyfriend, Richard Miles, just before Miles was to report to the Adult Correctional Institutions (ACI) to begin serving a sentence. The defense then proffered that Miles would testify that he already was incarcerated on the morning of March 1, 2003, and that it therefore was not possible that Janet had shared cocaine with Miles later that day.

In response, the state moved *in limine*, before defendant called his first witness, to exclude Richard Miles's testimony, arguing that Rule 608(b) of the Rhode Island Rules of Evidence precluded the admissibility of Miles's testimony because the proposed testimony was collateral to the central issues in the case and was offered solely to impeach Janet's testimony through extrinsic evidence. Rule 608(b) states in relevant part "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility * * * may not be proved by extrinsic evidence." [9] The state maintained that the identity of the person with whom Janet used cocaine at 3 p.m. on March 1, 2003, was not material evidence as to who assaulted her in the early morning of the next day.

---

**9.** Rule 608(b) of the Rhode Island Rules of Evidence provides:

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, or, in the discretion of the trial judge, evidence of prior similar false accusations, may not be proved by extrinsic evidence.

They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

The defendant argued at trial that Richard Miles's testimony was material and not collateral because it would suggest who the perpetrator was. The defendant implied that Janet lied about the person with whom she used cocaine in an effort to protect her attacker. The defendant also maintained that because evidence indicating who her attacker may have been was material to defendant's guilt or innocence, Rule 608(b) should not apply.

After hearing argument, the trial justice granted the motion *in limine* because he concluded that the testimony was collateral, and that extrinsic evidence may not be used to impeach a complaining witness. The trial justice ruled that the identity of Janet's cocaine partner ten hours prior to the sexual assault was irrelevant to determining who perpetrated the assaults on her. Significantly, the trial justice emphasized that the complainant admitted to using cocaine and to being with other male customers after the cocaine use, but before she was assaulted. The trial justice reasoned that the break in time and the complainant's interaction with multiple people after her cocaine use rendered the identity of her companion at 3 p.m. the preceding afternoon collateral to the issue of who attacked her in the early hours of the following morning.

On appeal, defendant renews his argument that the trial justice erred in granting the state's motion *in limine* because Richard Miles's testimony was material, not collateral, and therefore Rule 608(b)

was not a basis for excluding this testimony.[10]

## Standard of Review

■ "When reviewing the grant or denial of a motion *in limine*, this Court will consider only whether the challenged evidence was proper and admissible and, if not, whether there was sufficient prejudice to constitute reversible error." *State v. Gomes*, 881 A.2d 97, 111 (R.I.2005). In light of this standard, this Court must determine whether Richard Miles's proposed testimony that he was imprisoned on March 1, 2003, and therefore could not have used cocaine in Woonsocket at 3 p.m., as Janet testified, was proper and admissible at defendant's criminal trial. If this Court were to conclude that the trial justice erred by excluding Richard Miles's testimony, then we must determine whether the exclusion of this testimony was sufficiently prejudicial to warrant reversing the jury's verdict. *See Gomes*, 881 A.2d at 111.

## Rule 608(b)

■ The defendant argues that Richard Miles's testimony was material and relevant, and therefore not barred by Rule 608(b), because it would focus the jury's attention on the possibility that one of Janet's companions that afternoon later may have attacked her, or, alternatively, that one of her several drug dealers may have assaulted her.

**10.** The defendant also raised, for the first time on appeal, an additional argument that the trial justice's refusal to allow defendant to call Richard Miles to the stand denied him his Sixth Amendment right to present an effective defense. This Court will not address defendant's contention that his Sixth Amendment right to present an effective defense was violated because this issue never was raised at trial and therefore is waived on appeal. *See*

*State v. Merida*, 960 A.2d 228, 236 (R.I.2008) (holding defendant's Sixth Amendment Confrontation Clause argument waived, and therefore not reviewable on appeal, because it never was presented at trial). Even if we were to consider defendant's argument, it is axiomatic that a defendant has no right to introduce evidence that is inadmissible under our well-developed rules of evidence.

■ This Court has consistently held that "[a] witness may not be impeached on collateral matters by the introduction of extrinsic evidence. The cross-examiner is restricted to the answers of the witness." *State v. Martinez*, 824 A.2d 443, 449 (R.I.2003) (quoting *State v. Tutt*, 622 A.2d 459, 462 (R.I.1993) and *State v. Brown*, 574 A.2d 745, 749 (R.I.1990)). Evidence is not collateral if the evidence is admissible for a reason other than to contradict the witness's testimony. *Id.* (citing *State v. Souza*, 708 A.2d 899, 904 (R.I. 1998)). In *Martinez*, this Court held that proffered testimony concerning what occurred several hours before a sexual assault occurred, that was unrelated to the sexual assault at issue, was collateral because the testimony's "sole purpose was to impeach [the complainant] on collateral matters." *Martinez*, 824 A.2d at 449.

■ When a criminal defendant accuses someone else of committing the crime with which he is charged, the defendant must make some reasonably specific offer of proof as to who the perpetrator might be. *Gomes*, 881 A.2d at 111 (citing *State v. Gazerro*, 420 A.2d 816, 824–25 (R.I.1980)). Absent such an offer of proof, this evidence could constitute "an impermissible invitation to the jury to speculate on a collateral matter." *Id.* at 112 (quoting *Gazerro*, 420 A.2d at 825). In *Gomes*, the state filed a motion in limine to exclude a police report, prepared one month before the victim's murder, in which the victim alleged that her former boyfriend was harassing her. *Id.* at 109–10. The defendant, who was not the former boyfriend, wanted the police report admitted to show that the former boyfriend had a motive to murder the victim. *Id.* at 111. We affirmed the trial justice's grant of the motion in limine, in part because the defendant failed to provide any evidence that would demonstrate that the former boyfriend murdered the victim, or that this person was even in the area where the murder occurred. *Id.* at 111–12.

Here, the proffered testimony of Richard Miles could be used only to impeach Janet's credibility on a collateral issue. We are not persuaded by defendant's argument that the identity of the person with whom Janet used drugs at 3 p.m. on March 1, 2003, sheds any light on the issue of defendant's guilt or innocence. Scanlon's suggestion about who else may have committed the crime is demonstrably thinner than that in *Gomes*. The defendant does not imply that any particular individual may have committed these crimes, other than unnamed drug dealers, nor does he advance any theory as to why someone else would have assaulted Janet.

In our opinion, Rule 608(b) barred defendant's use of Richard Miles's testimony to impeach Janet's recollection of the identity of her cocaine-using partner. Therefore, the trial justice did not err when he granted the state's motion *in limine*.[11]

**B**

**Felony Assault Conviction**

The defendant raises two challenges with respect to his conviction for felony assault based upon the dislocation of Janet's shoulder. First, he argues that his motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure should have been granted because, as a matter of law, the injury to Janet's shoulder fails to satisfy § 11–5–2(c)(2)'s requirement that the bodily injury involve a "protracted loss or impairment of the function of any bodily part,

---

11. We continue to cast a jaundiced eye to the overuse of motions *in limine*. *See State v. Clark*, 974 A.2d 558, 563–64, 563 n. 1 (R.I. 2009) ("admonish[ing] the state to wield its *in limine* sword carefully" to preserve defendant's constitutional safeguards).

member or organ." Second, defendant argues that the Double Jeopardy Clause of the United States Constitution and of article 1, section 7, of the Rhode Island Constitution bar his convictions for both count 5 (felony assault—assault with a dangerous weapon) and count 6 (felony assault—assault or battery resulting in serious bodily injury). We conclude, however, that defendant failed to preserve either argument for appeal.

### 1

### Rule 29  Motion for Judgment of Acquittal

■■■ As we have said on numerous occasions, to preserve a right to appeal the denial of a motion for judgment of acquittal under Rule 29 made at the close of the state's case, a defendant must renew the motion after he presents his own case. *See State v. Andreozzi,* 798 A.2d 372, 374 (R.I.2002). Although defendant appropriately moved for a judgment of acquittal at the close of the state's case, he failed to renew his motion after he called his own witnesses. Consequently, defendant's failure to renew his motion for judgment of acquittal forecloses his right to seek review of the trial justice's denial of his motion for judgment of acquittal. *Id.*[12]

Yet, even if defendant had preserved his right to appeal the denial of his motion for judgment of acquittal, we nonetheless would agree with the trial justice's adverse ruling.

■■■ The defendant argues that he was entitled to a judgment of acquittal on count 6, felony assault in violation of § 11–5–2, because the injuries to Janet's arm and shoulder did not rise to the level of severity necessary to support a conviction. Section 11–5–2(c) defines a "serious bodily injury" as a:

> "physical injury that: (1)[c]reates a substantial risk of death; (2) [c]auses protracted loss or impairment of the function of any bodily part, member or organ; or (3) [c]auses serious permanent disfigurement or circumcises, excises or infibulates the whole or any part of the labia majora or labia minora or clitoris of a person."

The defendant argues that Janet's dislocated right arm, for which she was required to use a sling for six weeks, along with pain medications, is insufficient to constitute a "protracted loss or impairment of the function of any bodily part" under the statute.

■■■ Recently, in *State v. Clark,* 974 A.2d 558, 573 (R.I.2009), we were asked to determine what constitutes a serious permanent disfigurement under subsection (c)(3) of the definition of serious bodily injury in § 11–5–2. In that case, we held that the question of "[w]hether the injuries inflicted * * * were serious and disfiguring were factual matters for the jury's consideration." *Clark,* 974 A.2d at 573. It is similarly our opinion that what constitutes a "protracted loss or impairment of the function of any bodily part, member or organ" under subsection (c)(2) of 11–5–2 is a factual matter left for the jury's determination. The jury instructions appropriately required the jury to

---

12. The waiver of a right to appeal a denial of a motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure does not operate as a waiver of the right to appeal the denial of a motion for new trial if the motion for a new trial is premised upon an insufficient evidence of guilt claim. *See State v. Clark,* 974 A.2d 558, 568–69 (R.I.2009); *State v. Colbert,* 549 A.2d 1021, 1023 (R.I.1988) (determining the defendant did not waive right to have sufficiency of evidence reviewed in motion for new trial even though the defendant failed to renew motion for acquittal). No such motion is made here because defendant failed to properly raise, either in Superior Court or in this Court on appeal, that the evidence was insufficient to convict him.

find beyond a reasonable doubt "that the defendant assaulted [Janet] and that in doing so he seriously injured her shoulder area such that she lost the functional use of her shoulder or arm for a protracted period of time, that is to say a prolonged or extended period of time." The defendant never objected to this jury instruction.

The jury heard evidence from Janet that she felt her shoulder break when defendant grabbed her arm and that it was necessary for her to wear a sling for six weeks and take pain medications. Further, Dr. Asiedu testified that Janet suffered a dislocation of her right arm. Viewing this evidence in the light most favorable to the state, there is no question that Janet's injury cleared the statutory hurdle and properly was submitted to the jury.

### 2

### Merger of Counts 5 and 6

Although we also are satisfied that whether count 6 (felony assault—assault or battery resulting in serious bodily injury) merged with count 5 (felony assault—assault with a dangerous weapon), therefore implicating the Double Jeopardy Clauses of the United States and Rhode Island Constitutions was not preserved, we nonetheless address this argument. We have held that a defense based upon double jeopardy must be raised in a pretrial motion to dismiss under Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure. *See State v. Day*, 925 A.2d 962, 977 (R.I.2007). Rule 12(b)(2) provides that "[t]he defense of double jeopardy * * * may be raised only by motion before trial." *See also Day*, 925 A.2d at 977; *State v.*

*Grayhurst*, 852 A.2d 491, 500 (R.I.2004). Rule 12(b)(2) further states that "[f]ailure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver." *See also State v. McGuy*, 841 A.2d 1109, 1115 (R.I. 2003) (stressing defendant needs to demonstrate "some compelling reason to grant relief from the waiver sanction of Rule 12(b)(2)").[13]

In this case, defendant did not file a Rule 12(b)(2) motion to dismiss. Therefore, defendant is barred from raising double jeopardy as a defense unless he can demonstrate some extraordinary justification for not doing so earlier. On the other hand, defendant's trial occurred in 2005, almost two years before the *Day* decision made the law explicitly clear. *Cf. Day*, 925 A.2d at 977 (holding that cause existed in part because of murkiness in the case law on this issue). Further, although no motion was filed under Rule 12, the trial justice nonetheless entertained argument on this issue when he heard defendant's motion for judgment of acquittal and he ruled on the issue. Under all the circumstances present here, it is our opinion that defendant's double-jeopardy claim, although not properly raised, should be considered by this Court.

To determine whether a criminal defendant is imperiled by double jeopardy, this Court applies the "same evidence" test first pronounced in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See State v. Davis*, 120 R.I. 82, 86, 384 A.2d 1061, 1064 (1978) (acknowledging adoption of *Blockburger* test). Under the same-evidence test, "where the same act or trans-

**13.** In *State v. Day*, 925 A.2d 962, 977 (R.I. 2007), we determined that cause existed because this Court previously had not "focused with maximal explicitness on the necessity of bringing a merger argument to the attention of the trial court through a pretrial [Super.R.Crim.P.] 12(b)(2) motion" and because the trial justice dealt with the merger issue when considering the defendant's motion for judgment of acquittal.

action constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Davis*, 120 R.I. at 86, 384 A.2d at 1064 (quoting *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180); *see also State v. Bolarinho*, 850 A.2d 907, 909 (R.I.2004).

This is not the first time that we have addressed the issue of whether multiple assault convictions merged after a double-jeopardy analysis. In *Bolarinho*, 850 A.2d at 911, the defendant, in a single incident, repeatedly kicked the complainant. From this single occurrence, the defendant was charged with two counts of felony assault in violation of § 11–5–2; one count for committing a felony assault by use of a dangerous weapon, to wit a shod foot, and one count for committing a felony assault that resulted in serious bodily injury. *Bolarinho*, 850 A.2d at 908–09. We considered whether "a conviction for both assault with a dangerous weapon and assault resulting in serious bodily injury resulting from the same transaction may stand." *Id.* at 911. The Court held that when the evidence used to convict the defendant of assault with a dangerous weapon and assault resulting in serious bodily injury is identical, the counts merge under a double-jeopardy analysis. *Id.*

▌ Alternatively, in *State v. Haney*, 842 A.2d 1083, 1084–85 (R.I.2004), we considered whether a defendant's two domestic-assault convictions on the same complainant on the same night could withstand scrutiny under a double-jeopardy analysis. The incidents were separated by fifteen minutes, and one assault occurred in Burrillville while the other assault occurred in Glocester. *Id.* The defendant argued that, because he and the complainant were together in a car throughout the entire fifteen-minute in-

terval between assaults, both were part of a continuing transaction. *Id.* at 1085. We rejected the defendant's double-jeopardy argument because the acts underlying the two convictions were separate acts. *Id.* The victim was identical, but the assaults occurred at different times and in different towns, and the defendant had "sufficient opportunity to reflect on his assaultive conduct and to forbear from committing another crime" before he committed the second assault. *Id.*

Applying the *Blockburger* "same-evidence" test to the case before us, we first consider whether the facts underlying counts 5 and 6 constitute the "same act or transaction." *Davis*, 120 R.I. at 86, 384 A.2d at 1064 (quoting *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180). Count 5 alleged that defendant assaulted the complainant with a screwdriver, a dangerous weapon. Conversely, count 6 alleged that defendant committed a felony assault on the complainant by later grabbing her arm and dislocating it. On their face, the facts alleged in each count do not constitute the "same act or transaction," because each assault arises from a different act. Nothing in the record indicates that the use of the screwdriver caused the complainant's right arm to dislocate. Unlike in *Bolarinho*, in which the same evidence of kicking the victim was used to support both an assault with a dangerous weapon and an assault resulting in serious bodily injury, here the two counts are supported by different evidence. *See Bolarinho*, 850 A.2d at 911. Therefore, the trial justice was correct when he ruled that counts 5 and 6 did not merge and did not violate defendant's constitutional protection against being placed into double jeopardy.

### C

### Motion for New Trial

In his motion for a new trial before the trial justice, and now on appeal, defendant

advances two theories of relief. First, he says that the evidence introduced at his trial was not sufficient to support a conviction. Second, defendant claims that he is entitled to a new trial because the state twice violated its discovery obligations by failing to disclose, until the eve of trial, evidence that was critical to his defense. Therefore, he says, he was denied an "ample and sufficient opportunity to establish the best and fullest defense available to him." *State v. Scurry*, 636 A.2d 719, 725 (R.I.1994).

## Standard of Review

■ We review a trial justice's decision on a motion for a new trial with deference. *See State v. Flori*, 963 A.2d 932, 937 (R.I.2009). If the trial justice communicates a passable rationale for his decision, his ruling "is entitled to great weight." *Id.* (quoting *State v. Bergevine*, 942 A.2d 974, 981 (R.I.2008)). We will not overturn the trial justice's denial of a motion for new trial "unless the trial justice was clearly wrong or * * * overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *Id.* After carefully reviewing the record in this case, we conclude that neither of defendant's arguments have merit and that the trial justice was correct when he denied the motion. We address each argument individually.

### 1

### Claim of Innocence

The trial justice clearly articulated his rationale when he denied the motion for a new trial. He said that he did not disagree with the jury's finding of guilt on all six counts. Reviewing the testimony, the complainant's injuries, and her medical records, the trial justice ruled that the

assaults had occurred just as she said they did. Despite the conflicts between Janet's earlier statements to the police and medical personnel and her trial testimony, he nonetheless found her to be a credible witness. Further, the trial justice said that he understood why the jury would discount the testimony of Roxanne Pare, defendant's former girlfriend and the mother of his two children, with respect to the 1:20 a.m. phone call and subsequent visit by defendant. Finally, the trial justice stated "the credible evidence fairly and beyond a reasonable doubt pointed to this defendant, Tim Scanlon, as the man who abused [Janet]."

The trial justice's decision on the motion for a new trial is not clearly wrong, nor did he overlook material evidence. *See Flori*, 963 A.2d at 937. We agree with his decision and will not disturb it.

### 2

### Discovery Violations

■ The defendant argues that two issues, the late disclosure of the complainant's delayed memory of sexual intercourse with her attacker, and the tardy notice on Lt. Paul's forensic examination of the 1988 GMC Jimmy, warrant a new trial in the interests of justice. The defendant contends that he was denied "ample and sufficient opportunity to establish the best and fullest defense available to him."

As a threshold matter, the state argues that defendant has failed to preserve his right to appeal the two alleged discovery violations because he failed to seasonably object to the introduction of this testimony. The state argues that, even though Rule 33 of the Superior Court Rules of Criminal Procedure permits a court to order a new trial "in the interest of justice," it does not remove the burden from defendant to contemporaneously object at trial.[14]

14. The Committee Notes for the 2002 Amendment to Rule 33 of the Superior Court Rules of Criminal Procedure state that "[i]t is not

intended nor anticipated that the ability to raise an error of law on a motion for new trial will change the * * * harmless error, plain

**1280**

First we consider the state's contention that defendant waived his right to appeal the late disclosure of both Janet's recovered memory and Lt. Paul's forensic examination of the 1988 GMC Jimmy. The state is correct that defendant never objected to the complainant's recovered memory, either when it was first disclosed to him, or when Janet was on the witness stand. Likewise, defendant never objected to the state's calling of Lt. Paul to testify about the processing of the 1988 GMC Jimmy with luminol.[15] The defendant's only objection on the record occurred when Lt. Paul testified regarding false positive results from luminol testing.[16] The defendant never requested a continuance so that he could evaluate or prepare for the tardily provided material. When defendant raised his alleged discovery violations arguments before the trial justice in defendant's motion for a new trial, the trial justice noted in his ruling that defendant "did not object * * * during the course of the trial."

This Court has held that a "defendant may not press * * * objections [on appeal] when they were available for him to raise before or at the trial, yet he neglected to do so." *Cronan ex rel. State v. Cronan,* 774 A.2d 866, 879 (R.I.2001) (citing *State v. Anderson,* 752 A.2d 946, 948 (R.I.2000)). In *State v. Crudup,* 842 A.2d 1069, 1073 (R.I.2004), we held that even a due process argument is waived for appeal if defendant had an opportunity to raise this argument in a hearing but failed to do so.

After a careful review of the record in this case, we hold that the defendant was precluded from raising a claim in his motion for a new trial, and here on appeal, that the late discovery of Janet's recovered memory and Lt. Paul's testing of the 1988 GMC Jimmy prejudiced him because he failed to object either at the time this evidence was disclosed to him or introduced at trial.

## III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgments of convictions in this case. The record shall be returned to the Superior Court.

---

error, and contemporaneous objection rules generally applicable to trials."

**15.** At trial, Lt. Paul testified that luminol testing can result in false positives in which the luminol test is positive but not as a result of blood. For example, some cleaning products may result in a false positive. Lieutenant Paul also testified that no hair or fibers that would connect the truck to Janet were found in the vehicle. After completing his forensic examination, Lt. Paul determined that nothing was found in the truck that should be sent to the state crime lab for further testing. The state did not disclose Lt. Paul's examination of the vehicle or its negative results until just before the trial began.

**16.** The record of defendant's objection is as follows:

"[**Prosecutor**]: What do you mean by that?
"[**Lieutenant Paul**]: What I mean by that is luminal [sic] will react with certain cleaning based product cleansers. Seeing the vehicle was crushed in a pile of other vehicles, we were getting many pieces of things that fluoresce without a positive reaction for being a pool of blood or for what we were looking for any kind of evidentiary value.
"[**Prosecutor**]: But if there is blood in the car at one point and then cleaned it would be a false positive?
"[**Defense Counsel**]: Objection.
"[**Lieutenant Paul**]: It's possible, I believe.
"[**Court**]: I'll permit.
"[**Prosecutor**]: Sorry. I didn't hear your answer.
"[**Lieutenant Paul**]: It's possible."