STATE

v.

Wayne WRIGHT.

No. 2000–8–C.A.

Supreme Court of Rhode Island.

Jan. 28, 2003.

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Catherine A. Gibran, Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Excited utterances of the defendant's mother on the day of the murder, together with the present-sense impressions that she related during two telephone conversations with her friend, aided a Superior Court jury in finding the defendant, Wayne Wright (Wright or defendant) guilty of felony murder. The court sentenced him to serve not only a mandatory life sentence, but also, because of his status as a habitual offender, an additional twenty-five year consecutive sentence without the possibility of parole.

Wright argues on appeal that the trial justice erred when he admitted these statements into evidence. During two telephone conversations with her friend, Gaynell Clark (Clark), Barbara Wright (Mrs. Wright), who was defendant's mother, told Clark how she stumbled across what turned out to be the victim's pocketbook in her closet, and then she begged Clark not to tell anyone about this discovery. Wright contends that these statements constituted highly prejudicial hearsay that did not qualify for admission into evidence under any recognized exception to the hearsay rule. *See* Rule 802 of the Rhode Island Rules of Evidence ("Hearsay is not admissible except as provided by these rules or by any statute or rule of the United States or Rhode Island prescribed pursuant to statute or constitutional authority."). The defendant also argues on appeal that the trial justice improperly excluded the presentation of certain evidence that his attorney sought to elicit during the cross-examination of a prosecution witness, which was critical, he asserts, to his "somebody else could have done it" defense.

Because the challenged statements of defendant's mother were both relevant and admissible under recognized exceptions to the hearsay rule and because the trial justice did not commit reversible error when he sustained the prosecutor's objection to certain of defense counsel's cross-examination questions that exceeded the scope of the direct examination, we reject these arguments and affirm the conviction.

### Facts and Travel

On August 20, 1994, at five in the morning, a paper carrier discovered a corpse lying in a pool of blood in the stairwell of a Providence apartment building. The body was so badly beaten that the paramedics from the local fire station could not immediately determine the victim's sex. Eventually, the police identified the victim as Florence Hill (Hill), a seventy-year-old retired woman who lived in the building. According to the testimony of the medical examiner, Hill's death was a homicide caused by massive brain injuries and skull fractures from blunt-force trauma.

During their investigation, the police ascertained that Hill had departed from a pinochle game on Bridgham Street in Providence between midnight and 1:30 a.m. in the early morning hours of August 20. Other than the murderer, the last person to see Hill alive was the taxi driver who dropped her off at the apartment building in the wee hours of the morning. He waited for Hill to safely enter the building's front doors before driving away.

After five days of investigation, which included speaking with Clark, the police concluded that Wright was their prime suspect. Wright's mother lived in the same apartment building as Hill. Clark told the police, and later testified at trial, that Mrs. Wright called her on August 20 and they talked about Hill's murder. During the course of that initial conversation, Clark said that she suddenly heard something fall on the other end of the line, at which instant Mrs. Wright exclaimed, "Oh my God!" Mrs. Wright then proceeded to tell Clark that she just found a pocketbook in her apartment on the top shelf of her closet, and that it contained a pack of Montclair cigarettes. Mrs. Wright said she was going to call her son because it was not her bag. Clark then called Mrs. Wright back a half-hour later on that same day. During that second conversation, Mrs. Wright begged Clark not to tell anyone about their previous telephone call. A few days later, in another conversation, Mrs. Wright told Clark that she had thrown the bag away.

Mrs. Wright confirmed at trial that she found a black purse containing Montclair cigarettes and a change purse while she was cleaning out her closet and chatting with Clark on the telephone. After speaking to Clark, she called her son. He told her that he had found the purse the night before—that is, on the evening of August 19, 1994—near the telephone table in the lobby of the building and that he then took it, thinking that it probably contained money. Mrs. Wright at first kept the pocketbook in her closet, but then she moved it into a drawer in her bedroom. Initially, she did not volunteer any information to the police, but she later admitted that she found the pocketbook in her closet. The police never recovered the change purse.

Eventually, the police searched Mrs. Wright's apartment. They seized some items of clothing and shoes belonging to defendant, as well as a black pocketbook that they later identified as belonging to Hill. The only item remaining in the pocketbook was tobacco residue, but testing failed to link it with any particular brand of tobacco or cigarettes. Yet the evidence established that Hill usually smoked Montclair 100 cigarettes. The police also tapped two later telephone calls between Clark and Mrs. Wright, but the trial justice excluded the audiotapes and transcripts of those calls from the evidence.

Six days after the attack, the police obtained an arrest warrant for Wright. A detective testified that Wright previously had told him that he was home all evening on August 19 and that he had fallen asleep on the couch after smoking "weed" and drinking a "forty ouncer" of beer. Wright stated that he did not hear anything on the evening of August 19 and into the early morning of August 20—until his mother's friend called him at about 2 a.m. to alert him that Mrs. Wright needed to be let into the apartment building. Allegedly, he had not seen Hill at all during this period. But a video surveillance tape of the lobby in the apartment building showed that Wright had been in the lobby at various times just before midnight and then again in the early morning of August 20. Indeed, the videotape showed him there at 11:38 p.m., at 11:51 p.m., at 12:18 a.m., at 12:30 a.m., at 12:34 a.m., at 12:56 a.m., and again at 1:50 a.m. The tape also revealed that at 12:56 and 12:57 a.m., Wright and Hill were in the lobby at the same time and, most incriminating of all, it showed them both entering the same elevator together. Indeed, Hill could be seen clutching her pocketbook as she headed down the hall toward the elevator before she boarded it with Wright. It was the last time Hill appeared on the tape or was seen alive. Mrs. Wright admitted that when she came home that night her son was not wearing the same clothes as when she left the apartment.

The state charged Wright with first-degree murder under G.L.1956 § 11–23–1, and a jury ultimately returned a guilty verdict. The trial justice reserved decision on a motion for judgment of acquittal, but later denied it, as well as Wright's motion for a new trial. The trial justice then imposed a mandatory life sentence. Following the submission of a presentencing report and a hearing on Wright's status as a habitual offender, the trial justice sentenced defendant to an additional twenty-five-year consecutive sentence without the possibility of parole.

## Analysis

### I

### Admission Into Evidence of What Wright's Mother Told Her Friend During Their Unrecorded Telephone Conversations

Wright argues on appeal that the trial justice erred in allowing his mother's

friend to testify about certain remarks that his mother allegedly made to her during two unrecorded telephone conversations they had with each other on August 20, 1994, the day of Hill's murder. He contends that these statements were not only hearsay but also were highly prejudicial and inadmissible under any recognized exception to the hearsay rule. Wright insists that the trial justice should have excluded from the evidence his mother's statements to Clark during these calls. He suggests that they conveyed the impression that his mother believed he was guilty of this crime. And because his mother also disclosed to Clark, during one of the taped telephone conversations, that she had thrown away the victim's pocketbook, admission of this evidence, he posits, conveyed the impression of an attempted cover-up.

The hearsay rule precludes a party from introducing into evidence any out-of-court statements that are offered for the truth of the matters asserted therein—unless they fall within some recognized exception to the rule. *See* R.I. R. Evid. 801 and 802. The hearsay rule, however, has many exceptions. Among them are present-sense impressions. "The rationale for the exception * * * is that the contemporaneity of the event and statement 'negative the likelihood of deliberate or conscious misrepresentation.'" R.I. R. Evid. 803(1) Advisory Committee Note (quoting Advisory Committee's Note to Rule 803(1) of the Federal Rules of Evidence). Statements that fall within the exception for present-sense impressions are trustworthy because no apparent loss of memory affects their accuracy, and there is little or no time for any calculated misstatements by the declarant. 2 Barbara E. Bergman & Nancy Hollander, *Wharton's Criminal Evidence* § 6:19 at 176 (15th ed.1998). They also are usually communicated to someone who has had the opportunity to observe and verify whether they contain any misstatements. *Id.* Present-sense impressions are limited to statements uttered by a declarant while he or she is perceiving an event or condition, and to those statements that occur immediately thereafter. *Id.* at 177.

■ Thus, before admitting such evidence, the trial justice must find that the statements in question satisfy the elements of present-sense impressions, as set forth in Rule 803(1). Pursuant Rule 803(1), a present-sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." In this case, the prosecution argued that Mrs. Wright's statements in the first two unrecorded telephone conversations between herself and Clark were admissible, both as her present-sense impressions under Rule 803(1) and as her excited utterances under Rule 803(2). The first telephone conversation included her statements pertaining to the unfamiliar pocketbook she had found in her bedroom closet while she was on the telephone talking to Clark and cleaning out the closet. The rest of the conversation involved Clark asking Mrs. Wright whether the pocketbook was hers, whether she knew who it belonged to, whether she intended to call anyone about it, and Mrs. Wright's telling Clark that she would call her back later after she talked to her son. The defendant conceded that the discovery of the pocketbook, its contents, and its location in the closet, as well as Mrs. Wright's exclamation upon finding the pocketbook—"Oh my God!"—were all admissible, but he suggests that the ensuing conversation between them about Mrs. Wright's thoughts and speculations about the purse were not. But these statements, we hold, were all part of a spontaneous exchange of words that occurred more or less contemporaneously with the startling

event of Mrs. Wright's unexpectedly finding Hill's pocketbook and its contents in her closet and then discovering that her son apparently was responsible for bringing the pocketbook into her apartment. Mrs. Wright lacked time to reflect before speaking because the telephone communications with Clark took place as she was both perceiving these events and immediately thereafter. Thus, these statements qualified under the present-sense-impression exception to the hearsay rule.[1]

■ Excited utterances also qualify as exceptions to the hearsay rule.[2] The rationale for this exception "is that a startling event may produce an effect that temporarily stills the declarant's capacity [for] reflection and produces [at the same time] statements [that are] free of conscious fabrication." *State v. Torres,* 787 A.2d 1214, 1222 (R.I.2002) (quoting *State v. Krakue,* 726 A.2d 458, 462 (R.I.1999) (per curiam)). "Contemporaneity is not required for excited utterances, nor is any specific proximity in time." *See* R.I. R. Evid. 803(2), Advisory Committee's Note.

Spontaneous exclamations can be admitted as an excited utterance—even if the statement is not strictly contemporaneous with the exciting event—if, after considering all the facts in the case, it is apparent that the declarant was still laboring under the stress of the excitement produced by the event described when he or she uttered the statement in question.[3] *State v. Vaccaro,* 111 R.I. 59, 62–63, 298 A.2d 788, 790 (1973); *see also State v. Burgess,* 465 A.2d 204, 207 (R.I.1983). "The guarantee of trustworthiness [for the excited utterance exception] is assured as long as the declarant made the statement as an 'instinctive outpouring' or an 'effusion.'" *Krakue,* 726 A.2d at 462 (quoting *State v. St. Jean,* 469 A.2d 736, 738 (R.I.1983)). Thus, a statement that occurs in response to an event that is traumatic or startling qualifies as a spontaneous utterance if it was uttered while the declarant was laboring under the stress of the excitement caused by that event. *Id.,* (citing *State v. Creighton,* 462 A.2d 980, 983 (R.I.1983)).

"* * *

"A useful rule of thumb is that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process." 2 John W. Strong, *McCormick on Evidence,* § 272 at 206, 207 (5th ed.1999).

1. At a January 20, 1998, pretrial hearing, Wright moved *in limine* to exclude parts of the unrecorded conversations between Clark and his mother on August 20, 1994, and to fully exclude two later tape-recorded conversations between them. The trial justice initially ruled that he would permit introduction of certain portions of the two recorded telephone conversations. During the trial, however, the trial justice excluded both the tapes and the transcripts of the recorded telephone conversations. And with respect to the two earlier unrecorded conversations, he also excluded from Clark's testimony her statement that Mrs. Wright told her, "I already lost one son."

2. "In all cases, the ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event. Initially, it is necessary that the declarant be affected by the exciting event. The declarant need not actually be involved in the event * * *.

3. The Advisory Committee Note to Rule 803 explains that, for a statement to qualify as an excited utterance, the time between the event and the statement is a relative consideration, leaving it to the trial justice's discretion to determine if "the declarant was still laboring under the stress of the nervous excitement when he or she spoke." *State v. Arruda,* 785 A.2d 565, 567 (R.I.2001) (mem.) (quoting *State v. Creighton,* 462 A.2d 980, 983 (R.I. 1983)).

Before such evidence will be deemed admissible, however, it must satisfy Rule 803(2). Rule 803(2) provides that an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The "[a]dmissibility of [a] spontaneous utterance[ ] is addressed to the sound discretion of the trial justice." *State v. Perry*, 574 A.2d 149, 151 (R.I.1990) (quoting *In re Daniel*, 456 A.2d 258, 260–61 (R.I.1983)). "[A]ny decision made by a trial justice concerning the admission of excited utterances shall not be overturned unless clearly wrong." *Id.*

In this case, the trial justice concluded that Mrs. Wright's statements in the second telephone conversation between herself and Clark on August 20, 1994, also qualified as spontaneous utterances. This second conversation, initiated by Clark, concerned what Wright said to his mother when she called him about the pocketbook. Although these out-of-court statements by Wright were admissible under Rule 801(d)(2)(A) as admissions by a party, what Mrs. Wright told Clark about these statements was still hearsay. In our opinion, however, the trial justice was not clearly wrong when he concluded that Mrs. Wright's statements occurred while she was still affected by the stress of discovering not only what appeared to be Hill's pocketbook in her closet, but also her son's apparent involvement with taking the pocketbook and putting it there. The second conversation also included Mrs. Wright's telling Clark not to discuss with anyone the discovery of the pocketbook in her closet. Because Clark called her, Mrs. Wright did not have time to reflect or consciously fabricate a statement since she had just finished speaking with her son concerning his involvement with the victim's pocketbook. In addition,

a mere half-hour had elapsed between the first and second telephone conversations. *State v. Arruda*, 785 A.2d 565, 567 (R.I. 2001) (mem.) (holding that communications by a victim of sexual abuse to the state's witnesses were admissible as excited utterances even if made some time after the stressful incident occurred because, considering her appearance and emotional state, the witness was still laboring under the stress of her recent experience); *State v. Oisamaiye*, 740 A.2d 338, 339–40 (R.I.1999) (per curiam) (holding that, although the time between nursing-home patient's injuries and the statements he made after he calmed down were unknown, his statements explaining what happened were admissible under the excited-utterance exception because he was still "laboring under the stress of a startling event"); *In re Ne–kia*, 566 A.2d 392, 394 (R.I.1989) (holding that statements of abuse made by children to a government investigator were admissible as excited utterances even if a significant time had lapsed between the last averred incident of abuse and the statements made to the investigator).

Thus, the trial justice was entitled to conclude that Mrs. Wright's statements in the second telephone conversation qualified as excited utterances because she spoke them while she was still affected by the stress of finding the victim's pocketbook in her closet and of discovering her own son's apparent role in putting it there. Her remarks dealt with these startling events, and the second conversation took place within half an hour of the first telephone call, just after she had concluded speaking with her son about the pocketbook. Consequently, we hold that the trial justice did not commit clear error in admitting these remarks into evidence.

The defendant argues that these statements were irrelevant, yet also highly

prejudicial to him. Admitting or excluding evidence on grounds of relevancy is addressed to the sound discretion of the trial justice, and that decision will not be reversed unless it constitutes an abuse of discretion. *State v. Jackson*, 752 A.2d 5, 10 (R.I.2000) (citing *State v. Marini*, 638 A.2d 507, 516 (R.I.1994)). A trial justice has broad discretion to exclude evidence under Rule 403 of the Rhode Island Rules of Evidence "that, if admitted, would be misleading or unduly prejudicial." *State v. Rice*, 755 A.2d 137, 152 (R.I.2000).

■ Because the statements in this case qualified as present-sense impressions and as excited utterances and because they were relevant to proving Wright's guilt for Hill's murder, the trial justice acted within his discretion in refusing to exclude such statements from the evidence. The statements were: (1) spoken relatively contemporaneous with the discovery of the victim's pocketbook (or within a brief period thereafter); (2) related to that discovery, and (3) uttered while the declarant was still under the excitement of finding the pocketbook in her apartment and of discovering her son's apparent role in placing it there. Although, the statements referred to Mrs. Wright's discovery of the victim's pocketbook in her closet and its contents, they did not directly address defendant's guilt or innocence. Lastly, the statements were not, as defendant alleges, "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." R.I. R. Evid. 403. On the contrary, these statements were admissible because they placed the victim's pocketbook in Wright's apartment, and revealed what Mrs. Wright found inside the pocketbook. The remarks were necessary to establish when, where, and how she found what turned out to be a critical piece of evidence (the victim's pocketbook) linking Wright to the victim.

## II

### Sustaining Objections to Cross–Examination Questions Directed to a State's Witness

■ Wright also argues on appeal that the trial justice violated his constitutional right to present a full and fair defense, to due process of law, and to a fundamentally fair trial by completely excluding the presentation of evidence critical to his defense that a third party was responsible for the murder. According to the Sixth and Fourteenth Amendments to the United States Constitution[4] and to article 1, section 10, of the Rhode Island Constitution,[5] individ-

---

4. The Sixth Amendment to the United States Constitution provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The Fourteenth Amendment provides, in pertinent part:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

5. Article 1, section 10, of the Rhode Island Constitution provides:

"In all criminal prosecutions, accused persons shall enjoy the right to a speedy and public trial, by an impartial jury; to be informed of the nature and cause of the accusation, to be confronted with the wit-

uals accused of a crime have the right to confront and to cross-examine the witnesses against them and to present evidence on their own behalf during their trials. "Due process requires that every defendant have a full opportunity to establish the best and fullest defense available to him [or her]." *State v. Patriarca,* 112 R.I. 14, 37–38, 308 A.2d 300, 315 (1973). Wright specifically alleges that while his attorney was cross-examining a police detective, the trial justice precluded him from attempting to show that the surveillance tape of the apartment-building's lobby revealed the presence of certain other individuals at the crime scene during the same period when the victim was murdered and that some of these individuals also had criminal records, thereby suggesting that someone besides Wright may have been the killer.

Upon cross-examination of the detective, who was testifying as a witness for the prosecution, Wright's counsel began to ask him about the surveillance tape and what it showed vis-à-vis the presence of other individuals in the lobby besides the victim· and defendant. He asked these questions despite the fact that the jury had neither heard nor seen these other portions of the tape during the direct examination of this witness or during any other portion of the trial. Defense counsel apparently wanted, through this witness, to establish on cross-examination that other residents of the apartment building included various substance abusers, probationers, and ex-convicts, and that the tape showed that some of them were present in the lobby at or about the time of the murder. He also sought to show that a certain apartment

resident, one Mr. Stanley Green, who was on probation at the time,[6] could be observed on the tape while he was entering the building at 11 p.m. and departing at 1:13 a.m., and that this occurred only a mere sixteen minutes after Hill had arrived at the building. In explaining the state's objection, the prosecutor stated that Wright also had a criminal record and, most importantly, the police found the pocketbook in Wright's home—not in Mr. Green's. The trial justice said that he would respond individually to each question and objection during the cross-examination, and indicated that he did not think that "the fact that [Green] ha[d] a criminal record ma[de] him necessarily a murderer." Wright's attorney then inquired whether he could ask the detective if Green was a suspect, but the trial justice said that would be "an attempt to create a smoke screen." The trial justice also sustained the state's objection to Wright's attorney questioning the detective about other individuals with criminal records who lived in the apartment building, whereupon defense counsel proceeded to take up another line of questioning. No offer of proof was forthcoming concerning the expected answers to this line of questioning, and defendant failed to raise the issue again. Nor did he seek to introduce such evidence as part of his case in chief.

■ It goes without saying that an appropriate defense to a charge of criminal misconduct is that another person was the true perpetrator of the crime. *See State v. Wiley,* 567 A.2d 802, 806 (R.I.1989). In this case, however, the court's decision to sustain the state's objection to various ques-

nesses against them, to have compulsory process for obtaining them in their favor, to have the assistance of counsel in their defense, and shall be at liberty to speak for themselves; nor shall they be deprived of

life, liberty, or property, unless by the judgment of their peers, or the law of the land."

6. The state admitted that, around the time of the crime, other people with criminal records also appeared on the videotape of the lobby.

tions about the alleged presence in the lobby of Mr. Green and other individuals allegedly shown on the surveillance tape occurred when defendant's attorney was cross-examining a prosecution witness. The scope of cross-examination is not unlimited and the questioning is subject to the sound discretion of the trial justice. *State v. Brennan*, 526 A.2d 483, 488 (R.I. 1987). Inquiries that are potentially misleading or irrelevant, that offer little or no probative value, or that exceed the scope of the direct examination are objectionable. *Id.* When defense counsel seeks in cross-examination "to open up new avenues of inquiry concerning the possible [ability and] motive of a third party to commit the crime of which the defendant is accused, the trial justice may properly exclude such evidence as a collateral matter"—unless defendant makes an offer of proof showing the third person's opportunity to perpetrate the crime and a proximate connection between that person's presence on the scene and the actual commission of the crime. *Brennan*, 526 A.2d at 488 (citing *State v. Gazerro*, 420 A.2d 816, 825 (R.I. 1980)). But evidence of a third person's potential motive or opportunity to commit the crime must not lead to jury speculation nor improperly open up collateral matters. *Gazerro*, 420 A.2d at 825.

■ Because defendant in this case failed to make an offer of proof and failed to introduce any evidence tending to show that, notwithstanding what the tape and the pocketbook's presence in his mother's home revealed about defendant's involvement with the victim, Green still could have committed the murder, the trial justice did not abuse his discretion in sustaining the state's objection to his attorney's attempt to cross-examine the detective on that subject matter. At side bar all defendant did was explain that his questions were intended to elicit from the detective

what type of individuals resided in the apartment building. But not only did these questions exceed the scope of the direct examination, but also defense counsel failed to lay a foundation for this line of questioning to show that the detective was aware of this information. Although the trial justice sustained the objections to the questions propounded to the detective about other individuals who were living in the apartment building when the murder occurred, defendant still had the opportunity to fully cross-examine the detective on other points and to introduce evidence on this very subject during his direct case by either recalling this witness or through other witnesses.

■ A trial justice has wide discretion in ordering the proof and in limiting the extent of cross-examinations. *State v. Tempest*, 651 A.2d 1198, 1212 (R.I.1995) (citing *State v. Lamoureux*, 623 A.2d 9, 14 (R.I.1993)); *see also State v. Botelho*, 753 A.2d 343, 345–46 (R.I.2000) (explaining that, in presenting a full and fair defense, an effective cross-examination is an essential element and is a right guaranteed by the State and Federal Constitutions) (citing *State v. Veluzat*, 578 A.2d 93, 94 (R.I. 1990)). This exercise of discretion is not reviewable except for clear abuse, and only if it constitutes prejudicial error. *Tempest*, 651 A.2d at 1212 (citing *State v. Anthony*, 422 A.2d 921, 924 (R.I.1980)). Clear abuse occurs when a defendant is prejudiced because his or her attorney is not allowed to engage in what is otherwise an appropriate line of cross-examination. *Id.* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986)).

We are persuaded that the trial justice in this case did not abuse his discretion when he restricted the cross-examination as he did. The defendant's right of confrontation was not violated. The defen-

dant had the opportunity to elicit the information he wanted to obtain from the detective by calling him on his direct case or through some other witness. Thus, the defendant was not precluded from introducing this evidence at the trial. In addition, at the pretrial hearing defense counsel simply explained that he needed more time to investigate Green's alleged criminal activities, but he failed to pursue this matter.[7] Finally, the defendant failed to make an offer of proof concerning what evidence he would have elicited if he were allowed to question the witness on this subject. For these reasons, we hold, the trial justice did not commit reversible error in sustaining the state's objection to this line of questioning during the cross-examination of the detective and that this ruling did not deny the defendant the opportunity to present a full and fair defense.

## Conclusion

In sum, we deny the appeal and affirm the conviction.

Justice LEDERBERG participated in all proceedings but deceased prior to the filing of this opinion.

---

7. At the close of the hearing on various pretrial motions, the state alluded to its motion *in limine* concerning the defense's apparent attempt to adduce evidence about one Stanley Green, that supposedly would point to him as the actual murderer. Wright's counsel said that he thought those motions were premature because he did not know whether or not he was going to introduce such evidence. The defense counsel explained that in order to argue the motion he needed more time for investigation. Counsel for defendant stated that "I need time to make a decision on whether or not I'm, in fact, going to produce this type of evidence, I don't know if I am." After this exchange the defense made no further mention of Stanley Green until counsel for defendant asked his questions during the cross-examination of the police detective. Even then, defense counsel did not proffer what he expected the answers would show concerning the relevance of this evidence, nor did he otherwise attempt to introduce any evidence tending to establish that Mr. Green had anything to do with the crime in question.