**Supreme Court**

No. 2011-345-Appeal.
(P2/10-3415AG)

State                              :

    v.                             :

Blake Covington.              :

NOTICE:     This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                               :

Blake Covington.                   :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  On September 29, 2010, a street fight erupted among several women in Pawtucket, Rhode Island.  The fracas was viewed by a large throng of onlookers, including one group consisting of Claudio Nieves (Nieves) and his friends and another comprising the defendant, Blake Covington, and his companions.  After the street fight, tensions between these two groups remained high.  This animosity culminated in a shooting that left Nieves paralyzed.  The defendant was identified as the gunman.

The defendant appeals from a judgment of conviction for multiple counts of felony assault and of using a firearm while committing a crime of violence, and one count of carrying a pistol or revolver without a license.  On appeal, defendant launches a three-pronged attack on his conviction.  First, defendant contends that the trial justice erred in admitting a statement Nieves made to police shortly after he was shot.  Second, defendant argues that the trial justice deprived him of his right to present a full defense by precluding him from presenting his third-party-perpetrator evidence.  Lastly, defendant claims that the trial justice erred when he denied defendant's motion for a new trial.  We affirm the judgment of conviction.

**Facts and Travel**

Early in the evening of September 29, 2010, Nieves called his two friends, Joel Luis (Luis)[1] and Johnny Ortega (Ortega), for a night of drinking. At approximately 7 p.m., Luis and Ortega picked up Nieves, and the three men travelled to Ortega's apartment in the Prospect Heights housing complex in Pawtucket. As the group drank beers in front of Ortega's apartment, several women began to engage in a fight in the street. Nieves and his friends watched the fray unfold until the police arrived, stopped the fight, and ordered the onlookers to disperse.

After the street fight, Nieves, Luis, and Ortega decamped to Ortega's backyard. While there, the group spotted Yamirca Arias (Arias), Luis's relative or friend,[2] and two other women in the backyard of Arias's building. Nieves and his friends joined them, and the drinking continued. As the evening progressed, the group's supply of beer dwindled, and Nieves and Ortega departed for the liquor store in order to replenish their stock. Upon their return at approximately 11 p.m., Nieves and Ortega learned that, in their absence, three men had entered the backyard and hostile words had been exchanged with the partygoers. Approximately one hour later, two of them returned; Arias recognized Jerry Jones (Jones) and later identified the other man as defendant.

The two groups immediately resumed their earlier contentious encounter. According to Arias, Luis grabbed Jones and demanded that he explain why he had disrespected Arias. Jones and Ortega then exchanged angry words, which escalated to the brink of a physical showdown when each of the men grabbed a glass bottle and positioned himself for a fight.

---

[1] The record is unclear on Luis's first name; at times, he is referred to as "Joel" and, at others, as "Yoel."

[2] Nieves testified that Arias and Luis are cousins. Although Arias also referred to Luis as her cousin, she clarified that Luis actually is her brother's cousin and not her cousin.

Ortega cornered Jones against the wall of the apartment building, but he eventually backed down, and no blows were exchanged. Nieves then asked Jones whether he was okay, and Jones responded by shoving Nieves. Nieves then swung a knife at Jones, and Jones walked away. Although tensions appeared to abate, peace was fleeting; Jones stormed back, and Luis declared, "[H]e's going to get us, and I'm going to be the one to give it to him."

Arias testified that, up until this point, defendant's role was somewhat peripheral.[3] As Jones again approached the group, however, defendant assumed a more prominent posture. The defendant was armed with a firearm and began firing several shots at the group. Three shots hit Nieves, and he fell to the ground. As defendant turned the gun on Luis and Ortega, the two promptly fled the scene, with defendant firing at Luis as he ran away. The defendant also fired in the direction of Arias, who took shelter behind a wall. The defendant, who was wearing boots, repeatedly kicked the wounded Nieves in the head as he lay on the ground. During this attack, Arias periodically would come out from behind the wall; and, each time, defendant would aim his weapon, causing her to retreat. The defendant placed the gun against Nieves's head and pulled the trigger; however, the empty weapon did not fire. When Arias told defendant that the police were coming, he ran off. Arias testified that Jones performed cardiopulmonary resuscitation until Nieves began to stir, at which point he too fled.

At approximately 12:10 a.m. on September 30, 2010, Pawtucket police Patrolman Justin Jesse (Ptlm. Jesse) responded to the scene. Patrolman Jesse asked Nieves what had happened. Nieves, who was drifting in and out of consciousness, had difficulty responding, but he was able to say, "Tell my father that I love him." Nieves ultimately survived the shooting, but he was rendered a paraplegic as a result. He testified that he still has a bullet lodged in his spinal cord.

---

[3] Contrary to Arias's testimony, Nieves testified that it was Jones and defendant, and not Jones alone, who were arguing with Ortega and Luis.

When Arias first spoke with the police, she told them that her name was Elizabeth Amporo. At trial, she testified that Elizabeth Amporo also is her name, although she generally is known as Yamirca Arias; she added that she had used her other name because she was afraid. She identified defendant from a photo array as the shooter. Approximately one week after he had been shot, Nieves also identified defendant as his assailant.

The defendant was charged, by way of criminal information, with a host of offenses, including: assault with intent to murder Nieves (count 1); three counts of felony assault of Nieves (counts 2, 3, and 6); three counts of using a firearm while committing a crime of violence (counts 4, 8, and 10); discharging a firearm within a compact area (count 5); felony assault of Arias (count 7); felony assault of Ortega (count 9); and carrying a pistol or revolver without a license (count 14).[4]

Prior to trial, defendant moved in limine to exclude, under Rule 403 of the Rhode Island Rules of Evidence, Nieves's statement to the police, "Tell my father that I love him." The defendant argued that the statement was not probative of any issue in the case and was highly prejudicial because of the danger that it would evoke an emotional response from the jury. The trial justice denied defendant's motion, explaining that the statement was relevant to show that Nieves knew he was injured and appreciated the seriousness of his injuries. The trial justice also found that there was no undue prejudice arising from the statement because it did not implicate defendant in the attack and the contention that the statement would result in an emotional

---

[4] Counts 1, 3, 5, 9, and 10 were dismissed by the state under Rule 48(a) of the Superior Court Rules of Criminal Procedure.

response from the jurors overlooked the fact that Nieves would be testifying from a wheelchair—an equally emotional circumstance.[5]

The defendant also sought to introduce evidence tending to show that Jones, and not defendant, was the shooter. In an evidentiary proffer to the trial justice, defendant asserted that Delon Jones (Delon), Jones's cousin, would offer testimony showing: that Jones had been involved in the street fight earlier in the evening of September 29, 2010; that Jones's niece was an active participant in that fight; and that Jones was very upset after that fight took place. Although the trial justice ruled that defendant would be allowed to show that Jones was angry earlier in the evening, he remained skeptical of whether defendant had stated a valid third-party-perpetrator theory.

At trial, the state called Pawtucket police Detective Richard LaForest (Det. LaForest). Prior to Det. LaForest's testimony, however, defense counsel alerted the trial justice that she planned to inquire about the interview Det. LaForest had with Jones, who was not a trial witness. Specifically, she intended to ask Det. LaForest whether, during his videotaped statement to Pawtucket police, Jones had stated that Nieves had swung a knife at Jones or defendant. Defense counsel explained that the statement was not being offered to prove the truth of the matter asserted—namely, that Nieves had swung a knife—but instead was being offered to show that Arias's testimony was the product of improper influence. The trial justice ruled that the proposed area of inquiry was off-limits, deeming Jones's statement to the police "rank hearsay."

The defendant presented two witnesses: defense investigator Steven Joseph Daigle (Daigle) and Delon. Daigle testified that, shortly before defendant's trial, he and defense counsel

---

[5] During trial, Nieves's statement to the police came before the jury through three witnesses: Ptlm. Jesse, Pawtucket police Patrolman Justin Gould, who heard Nieves make this statement to Ptlm. Jesse, and Nieves.

went to Prospect Heights and spoke with Arias. Daigle further testified that the conversation was conducted in English, that he had no problem understanding what Arias said, and that Arias did not appear to be having any problem understanding Daigle's questions. According to Daigle, when asked whether defendant was the shooter, Arias responded: "You don't understand. I have three children, and I have to live here." Daigle stated that, when he and defense counsel asked Arias why she identified defendant as the shooter in the photo lineup, she stated that she "was told to." Daigle further testified that, when asked who had told her to identify defendant as the shooter, Arias replied: "I have to live here. I have three children." According to Daigle, when he and defense counsel asked Arias whether Jones or Jones's mother told her to select defendant from the photo lineup, she terminated the interview, stating that she would prefer to have a Spanish interpreter present before she answered any further questions. Arias, who testified with the assistance of an interpreter at defendant's trial, unequivocally denied telling defense counsel or Daigle that anyone told her to select defendant from the photo lineup.

The defendant also attempted to elicit from Daigle testimony about his brief encounter with Jones's mother. At sidebar, defense counsel made an offer of proof that, when Daigle and defense counsel spoke to Jones's mother about the case and told her that they had spoken with a witness in the housing complex, she became very angry and began shouting at them. Defense counsel theorized that an inference could be drawn by the jury that, because Jones's mother knew that Arias had discussed the case with defense counsel, Arias denied that anyone attempted to influence her testimony. The state countered that this evidence was speculative and irrelevant. The trial justice agreed and did not permit this line of inquiry.

During Delon's direct examination, he described the circumstances surrounding the street fight among several women earlier in the evening; he testified that Jones's niece told him and his

companions about the fight at its inception and that he, Jones, and defendant went outside.[6] The trial justice permitted Delon to testify that, although Jones was never involved in a physical altercation, he was arguing with some of the people who were outside and that "he was kind of mad." Defense counsel asked Delon why he thought that Jones was "kind of mad[,]" to which he responded, "I don't know." When asked to describe what Jones looked like during this argument, Delon testified, "He looked like hisself [sic]." Delon further testified that he did not see anyone confront Jones with a weapon.

Defense counsel also attempted to elicit testimony concerning what Jones, defendant, and Delon did after the street fight had ended. When asked to describe how Jones was acting after the argument, Delon testified, over the state's objection, "Well, he was trying to forget about it, but he was--[.]" Before he could finish that answer, however, the trial justice declared: "We're not going to do that. That answer's stricken." At sidebar, defense counsel argued that, despite the trial justice's pretrial ruling that she could elicit testimony concerning Jones's demeanor after the altercation in the street, the trial justice had "completely prevented" her from doing so. The trial justice explained that he would not permit Delon to testify that Jones was trying to forget about the encounter; he further observed that defendant's proffer during his pretrial motion did not concern what transpired after the street fight when the trio returned to Jones's mother's house. However, Delon was permitted to answer defense counsel's question, "What was [Jones]

_____

[6] Delon testified that "it seemed like everybody was against us as soon as we walked out [of] the house[,]" and the trial justice sustained the state's objection. The trial justice permitted defense counsel to ask, over the state's objection, "What were the [thirty] or so people [who were outside watching or participating in the fight] doing?" After Delon testified, "I seen [sic] they was [sic] like they was [sic] trying to fight us[,]" a sidebar conference ensued, in which the trial justice explained to defense counsel: "If you want to focus on Jerry Jones and ask [Delon] what was Jones's reaction and what did he see Jones do, that's one thing. I don't want to hear about some kind of a gang fight out there."

doing [after the police broke up the street fight]?" He stated that, after the fight was over, "[the group] was * * * sitting on the couch taking turns on the [video] game."

The jury ultimately convicted defendant on all of the remaining counts in the information (counts 2, 4, 6, 7, 8, and 14). The defendant moved for a new trial, asserting two grounds. First, he argued that the verdict was against the clear weight of the evidence because Nieves testified that his assailant was the man who was arguing with him and his friends, and Arias testified that Jones was that man; the implication of this testimony, according to defendant, was clear: Jones, and not defendant, was the shooter. Second, defendant contended that the trial justice's limitation of Det. LaForest's cross-examination constituted an error of law necessitating a new trial.

The trial justice denied the new-trial motion. He explained that defendant had neglected to mention that both Arias and Nieves testified that the shooter was defendant, not Jones. Although he acknowledged that Arias and Nieves "arrived [at trial] with some baggage," the trial justice was "satisfied that their testimony was, as the jury obviously concluded, trustworthy and credible. And, therefore, the verdicts of the jury convicting * * * defendant of the several counts were well[ ]warranted." The total sentence imposed on the various counts of conviction amounted to an aggregate of sixty years at the Adult Correctional Institutions, with fifty years to serve.[7]

The defendant appeals, positing three grounds for vacating the judgment. The defendant first contends that the trial justice abused his discretion in denying his motion in limine to

---

[7] The trial justice sentenced defendant to twenty years on counts 2 and 6, to be served concurrently; twenty years without parole on count 4, to be served consecutive to count 2; ten years on count 7, to run consecutive to counts 2 and 4; ten years suspended, with probation, on count 8, to be served consecutive to counts 2, 4, and 7 and to be served without parole if defendant ever violates that probation; and ten years suspended, with probation, on count 14, to run concurrently with count 8 but consecutive to counts 2, 4, and 7.

exclude Nieves's statement, "Tell my father that I love him." The defendant next asserts that the trial justice improperly precluded him from presenting his third-party-perpetrator defense. Finally, defendant argues that the trial justice clearly erred in denying his motion for a new trial.

**Standard of Review**

"[I]t 'is well settled that we review a trial justice's decision admitting or excluding evidence under an abuse of discretion standard.'" State v. Brown, 42 A.3d 1239, 1242 (R.I. 2012) (quoting State v. Marmolejos, 990 A.2d 848, 851 (R.I. 2010)). We will reverse a trial justice's ruling on the admissibility of evidence only where "it constitutes a clear abuse of discretion." Id.; see also State v. Smith, 39 A.3d 669, 673 (R.I. 2012); State v. Dubois, 36 A.3d 191, 199 (R.I. 2012).

Additionally, "[w]e review a challenge to a trial justice's limitation on cross-examination under an abuse of discretion standard, and we will not disturb the exercise of that discretion absent a clear abuse of discretion." State v. Chum, 54 A.3d 455, 460 (R.I. 2012); see also State v. Peoples, 996 A.2d 660, 664 (R.I. 2010). "To constitute a clear abuse of discretion, the trial justice's ruling excluding the evidence must amount to 'prejudicial error.'" Chum, 54 A.3d at 460 (quoting State v. Stansell, 909 A.2d 505, 510 (R.I. 2006)).

Finally, "[w]hen a trial justice considers whether the verdict is against the weight of the evidence, he or she sits as the legendary thirteenth juror; and, in light of the charge to the jury, must exercise his or her independent judgment in weighing the evidence and assessing the credibility of the witnesses." Smith, 39 A.3d at 673 (quoting State v. Clark, 974 A.2d 558, 569 (R.I. 2009)). Compliance with this standard requires three steps: "[t]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have

reached a result different from that reached by the jury." Id. (quoting State v. Vargas, 21 A.3d 347, 354 (R.I. 2011)). If this process leads the trial justice to "the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." Id. (quoting State v. Heredia, 10 A.3d 443, 446 (R.I. 2010)).

Our review of a trial justice's ruling on a motion for a new trial is deferential; "[i]f the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Smith, 39 A.3d at 673 (quoting State v. Horton, 871 A.2d 959, 967 (R.I. 2005)). "We employ this deferential standard of review because 'a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" State v. Paola, 59 A.3d 99, 104 (R.I. 2013) (quoting State v. Texieira, 944 A.2d 132, 141 (R.I. 2008)).

**Analysis**

**I**

**Evidentiary Issues**

The first facet of defendant's appeal concerns an array of evidentiary rulings by the trial justice. First, defendant argues that the trial justice abused his discretion in denying his motion in limine to exclude Nieves's statement. Additionally, defendant contends that several evidentiary rulings of the trial justice effectively precluded defendant from presenting his third-party-perpetrator defense.

Rule 403 provides:

> "Although relevant, evidence may be excluded if its probative
> value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

It is well settled that "[t]he application of Rule 403 is committed to the sound discretion of the trial justice." Smith, 39 A.3d at 674 (quoting State v. Rios, 996 A.2d 635, 640 (R.I. 2010)). However, "a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly. * * * It is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it." Id. at 675 (quoting State v. DeJesus, 947 A.2d 873, 883 (R.I. 2008)); see also Brown, 42 A.3d at 1244.

## A

### "Tell my father that I love him."

The defendant first contends that the trial justice erred in admitting Nieves's statement to the police because, he argues, it was not relevant under Rule 401 of the Rhode Island Rules of Evidence.[8]   Alternatively, defendant asserts that, even if the statement meets Rule 401's relevancy threshold, it nevertheless should have been excluded as unfairly prejudicial under Rule 403.  We reject these contentions.

Initially, we are satisfied that Nieves's statement surmounted the relevancy threshold for admissibility.  Count 4 of the criminal information charged defendant with discharging a firearm while committing a crime of violence resulting in injury to Nieves in violation of G.L. 1956 § 11-47-3.2(b)(2).  Subsection (b)(2) of § 11-47-3.2 provides for a punishment of twenty years "if a person other than a police officer is injured by the discharge of the firearm" during the

---

[8] Rule 401 of the Rhode Island Rules of Evidence provides the following definition of relevant evidence: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

- 11 -

commission of a crime of violence. See § 11-47-3.2(a) ("No person shall use a firearm while committing or attempting to commit a crime of violence."); § 11-47-3.2(b)(2) ("Every person who, while committing an offense violating subsection (a) of this section, discharges a firearm shall be guilty of a felony and be imprisoned as follows: * * * (2) Twenty (20) years, if a person other than a police officer is injured by the discharge of the firearm * * *[.]"). Evidence that, when confronted with questions from the responding officer, all that Nieves could muster was, "Tell my father that I love him[,]" tends to establish that Nieves was "injured by the discharge of the firearm[,]" as § 11-47-3.2(b)(2) contemplates. (Emphasis added.) Therefore, the statement was relevant.[9]

With respect to defendant's Rule 403 argument, we agree with the trial justice that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. As the trial justice recognized, this statement in no way implicated defendant as the party responsible for Nieves's injuries. Moreover, although we agree with defendant that this statement may have had an emotional impact on the jurors, we note, as did the trial justice, that Nieves was testifying from a wheelchair, where he will spend the remainder of his life. Any emotional impact that Nieves's statement may have had pales in comparison to the impact of observing a wheelchair-bound victim—with a bullet still lodged in his spine—testify about the

---

[9] The fact that defendant may not have disputed the existence or extent of Nieves's injuries is of no consequence to our relevancy analysis. As we explained in State v. Bettencourt, 723 A.2d 1101 (R.I. 1999):

"When the state prosecutes a defendant, it carries the burden of proving every element necessary to the charge beyond a reasonable doubt, even if some of those elements may not be disputed. Because of this burden, the state has the right to establish the existence of those elements as it deems just." Id. at 1108 (quoting State v. Mora, 618 A.2d 1275, 1280 (R.I. 1993)); see also State v. Patel, 949 A.2d 401, 414 (R.I. 2008).

events leading to his paralysis.  Cf. State v. Spratt, 742 A.2d 1194, 1199 (R.I. 1999) (finding no abuse of discretion in the admission of a photograph of the murder victim that may have been taken on his wedding day because "[t]he jury heard evidence that [the victim] was married[;] [a]ny possible photographic proof of the fact would hardly inflame the juror's passions").  In light of our deferential standard of review, we cannot say that the trial justice abused his discretion in admitting this statement.

**B**

**Third-Party-Perpetrator Evidence**

The defendant next contends that the trial justice committed evidentiary and constitutional error by precluding him from fully pursuing his third-party-perpetrator defense. There are two components to this argument.  First, defendant argues that the trial justice impermissibly precluded him from eliciting evidence of Jones's purported motive to shoot Nieves during defendant's direct examination of Delon.  Second, defendant claims that the trial justice improperly excluded evidence that tended to show that Arias's testimony had been influenced by Jones or Jones's mother.  The defendant maintains that these evidentiary rulings by the trial justice, in addition to being erroneous, deprived him of his constitutional right to present a defense.

It is well settled that "[d]ue process requires that every defendant have a full opportunity to establish the best and fullest defense available to him." State v. Lomba, 37 A.3d 615, 621 (R.I. 2012) (quoting State v. Patriarca, 112 R.I. 14, 37-38, 308 A.2d 300, 315 (1973)); see also State v. Wright, 817 A.2d 600, 609 (R.I. 2003).  Similarly free from doubt is the "self-evident proposition that 'an appropriate defense to a charge of criminal misconduct is that another person was the true perpetrator of the crime.'" State v. Barros, 24 A.3d 1158, 1184 (R.I. 2011) (quoting

Wright, 817 A.2d at 609); see also State v. Gomes, 881 A.2d 97, 111 (R.I. 2005) ("There is no question that a defendant is entitled to present a defense that implicates another person."). This defense, however, is not without limits.

Third-party-perpetrator evidence is not per se admissible; unguarded use of "evidence of a third person's potential motive or opportunity to commit the crime [could] lead to jury speculation [or] improperly open up collateral matters." Wright, 817 A.2d at 610; see also State v. Scanlon, 982 A.2d 1268, 1275 (R.I. 2009); State v. Gazerro, 420 A.2d 816, 825 (R.I. 1980). A criminal defendant is required to make a "reasonably specific" offer of proof with respect to such evidence. Barros, 24 A.3d at 1184; see also Rivera v. State, 58 A.3d 171, 181 n.7 (R.I. 2013); Scanlon, 982 A.2d at 1275; Gomes, 881 A.2d at 111. The defense must be grounded on articulable facts, not fanciful speculation. The offer of proof must contain "[(1)] evidence of another person's motive to commit the crime with which a defendant is charged * * * in conjunction with other evidence tending to show [(2)] the third person's opportunity to commit the crime and [(3)] a proximate connection between that person and the actual commission of the crime." Rivera, 58 A.3d at 181 n.7 (quoting Gomes, 881 A.2d at 111); see also Barros, 24 A.3d at 1184; Gazerro, 420 A.2d at 825. Moreover, defense counsel must have "a good-faith basis for asking a witness about a given set of facts at trial because there is a danger that the jury may consider questions that are not factually based and then deliberate on matters that are not in evidence." Peoples, 996 A.2d at 665.

We address defendant's argument mindful that he was accorded leeway in pursuing this defense theory, notwithstanding the paucity of proof he produced at trial. In his proffer, defendant informed the trial justice that Delon would testify that Jones had been involved in the earlier altercation in the street; that Jones's niece was an active participant in that fight; and that

Jones was very upset after that fight took place.  Although the trial justice properly was skeptical that defendant's offer of proof was adequate to support this defense, defendant nevertheless was permitted to show that Jones was angry earlier in the evening of September 29, 2010.  To that end, Delon was permitted to tell the jury how Jones learned of the street fight; that Jones was not involved in a physical altercation; that he was arguing with some unidentified spectators; and that Jones "was kind of mad."  Additionally, the trial justice permitted defense counsel to ask whether Jones had been confronted with any type of weapon while the group was in the street— he was not.  Although the trial justice remarked that defendant's offer of proof did not encompass what transpired after the street fight, he permitted Delon to describe their activities after he, Jones, and defendant returned to Jones's mother's home: They played video games. The trial justice also permitted Delon, over the state's objection, to "describe the way Jerry was acting after" the group returned from the fight; it was only when Delon answered, "Well, he was trying to <u>forget</u> about it, but he was--" that the trial justice intervened and struck the answer. (Emphasis added.)  Finally, the trial justice allowed Daigle to testify, over the state's objection, that Arias told him that she selected defendant as the shooter because she "was told to[,]" and defense counsel cross-examined Arias on this statement.  Therefore, we reject the assertion that defendant was "completely prevented" from pursuing this defense.  We address his assignments of error in turn.

**1**

**Delon's Testimony**

The defendant argues that he was improperly prevented from eliciting testimony from Delon that the people involved in the street fight were "against" Jones and that the trial justice

erroneously prevented defendant from asking Delon how Jones was acting after the fight. We disagree.

With respect to Delon's testimony that the participants or onlookers of the street fight were "against" Jones, the trial justice refused to allow Delon to testify that there was some sort of gang fight in the street when, clearly, this was not accurate. Delon was permitted to testify that Jones was arguing with some of the people in the street and that "he was kind of mad." Delon also described how Jones looked during this argument. Thus, as defendant successfully elicited evidence of a verbal altercation involving Jones and Jones's reaction to that confrontation, we are hard-pressed to understand how Delon's impression that thirty people on the street were "against" Jones furthers defendant's third-party-perpetrator defense. Accordingly, we conclude that the trial justice did not abuse his discretion in limiting the scope of Delon's testimony in this manner.

The defendant next argues that he was improperly prevented from asking Delon how Jones was acting after the commotion had subsided. In response to defense counsel's question, "How would you describe the way Jerry was acting after that?", Delon testified, "Well he was trying to forget about it, but he was--[.]" In explaining his decision to strike that answer, the trial justice stated: "I'm certainly not going to permit him, if he was talking about Jerry Jones, to say that he was just trying to forget about it but couldn't, or something like that. I'm not going to let him speculate as to what Jones was thinking, [or] trying to do, from his subjective point of view."

The trial justice correctly recognized that a witness may not give an opinion as to the inner thoughts or feelings of another person or testify that another person was trying to forget something. See State v. Ellis, 619 A.2d 418, 423 (R.I. 1993) ("There is no rational basis upon

- 16 -

which a witness can determine that another person looks as though he has been threatened or is in court against his will. * * * [I]t can scarcely be contended that in the ordinary course of events a lay witness is able to determine such inner feelings as might arise if a person was threatened. This is a question that a lay witness (and probably most expert witnesses) would be totally unqualified to answer."); see also State v. Tep, 56 A.3d 942, 947 (R.I. 2012) (finding no error in the admission of a witness's testimony that the defendant "aimed" a gun at the witness and others and that the defendant "focused on—at, in my mind, hitting one of us" because the testimony "merely described what [the witness] perceived, not what he believed [the defendant] thought or intended"). The trial justice simply struck the improper response that Jones was trying to forget about the fight. Significantly, defense counsel neither rephrased the question nor endeavored to elicit admissible evidence about Jones's conduct after the fight. We discern no abuse of discretion in striking this answer.

## 2

### Evidence of Influenced Testimony

The defendant next argues that the trial justice erroneously excluded evidence that tended to show that Arias's testimony had been influenced by Jones or Jones's mother. Specifically, defendant contends that the trial justice erred in (1) prohibiting defendant from cross-examining Det. LaForest about Jones's out-of-court statement to the police and (2) denying defendant the opportunity to elicit testimony about Jones's mother's reaction to Daigle. We reject these contentions.

The defendant argues that Jones's statement to the police was not being offered for the truth of the matter asserted in the statement—that Nieves had a knife and swung it at Jones—but to show the similarity between Jones's statement and Arias's in-court testimony concerning

- 17 -

Nieves's use of a knife; defendant contends that, because Arias had never before stated that Nieves swung a knife at Jones, her testimony was influenced.

We are satisfied that the trial justice did not abuse his discretion in excluding this evidence because defendant's intended use of Jones's statement would invite the jury to seize on the mere fact that both Jones and Arias stated that Nieves swung a knife and then reach the conclusion that Jones had influenced Arias's testimony. This is a classic example of the type of impermissible speculation that our precedent in third-party-perpetrator cases condemns. See Wright, 817 A.2d at 610 ("[E]vidence of a third person's potential motive or opportunity to commit the crime must not lead to jury speculation nor improperly open up collateral matters."); see also Scanlon, 982 A.2d at 1275 (explaining the danger that "this evidence could constitute 'an impermissible invitation to the jury to speculate on a collateral matter'" quoting Gomes, 881 A.2d at 112); cf. State v. Momplaisir, 815 A.2d 65, 72-73 (R.I. 2003) (explaining that the "admissibility [of evidence that does not run afoul of the hearsay rules] is nonetheless addressed to the sound discretion of the trial justice and may be excluded if its introduction will lead to speculation and confusion of the issues[;] * * * [i]n deciding whether to admit testimony * * * of questionable probative value trial judges are required to conduct an evidentiary balancing test and are vested with broad discretion to exclude otherwise relevant evidence that may lead to speculation or confusion").[10]

Moreover, even if it were error to foreclose this cross-examination of Det. LaForest, we are convinced that any such error would have been harmless. The fact that Arias had not mentioned the knife-swinging incident in either her oral or written statement to the police came

---

[10] Although the trial justice did not exclude the evidence on this ground, we may affirm a trial justice's evidentiary ruling on other grounds. See State v. McManus, 990 A.2d 1229, 1235 (R.I. 2010) (recognizing the authority to affirm on other grounds).

before the jury during Det. LaForest's cross-examination. Additionally, Daigle testified about Arias's disclosure to him that "she was told to" identify defendant as the shooter, and defendant cross-examined Arias concerning this statement. Finally, defense counsel hammered home for the jury during closing argument that Arias had testified for the first time at trial that Nieves swung a knife at Jones, and she argued forcefully that this belated detail was the result of someone having influenced the witness. Thus, we are satisfied that, to the extent any error was committed below, it had no effect on the jury's guilty verdict.

We similarly are not persuaded by defendant's argument that the trial justice erroneously precluded Daigle from testifying about his interaction with Jones's mother. The defendant contends that Daigle would have testified that, when his conversation with Jones's mother turned to the shooting investigation, her demeanor instantly soured and she began yelling at defense counsel and Daigle. We are in full agreement with the prosecutor that this evidence invites "pure speculation"; there is not a scintilla of evidence in this case of any contact between Jones's mother and Arias, and the capstone of defendant's pyramid of inferences—that Jones's mother influenced Arias's testimony—rests upon conjecture and surmise. We are confident that the trial justice acted well within his discretion in excluding this highly speculative evidence. See Wright, 817 A.2d at 610; Momplaisir, 815 A.2d at 72-73.

## II

## Motion for New Trial

On appeal, as before the trial justice, defendant offers two grounds upon which his motion for new trial should have been granted. Initially, defendant asserts that, because the trial justice's limitation of his cross-examination of Det. LaForest regarding third-party-perpetrator evidence amounted to evidentiary and constitutional error, a new trial is warranted. As we have

already determined that the trial justice committed no error in foreclosing this line of inquiry during cross-examination of Det. LaForest, we deem this first prong of defendant's new-trial-motion argument to be without merit.

Additionally, defendant argues that the trial justice overlooked and misconceived material evidence indicating that Jones, and not defendant, was the shooter. In this regard, defendant points out that Nieves testified that defendant was arguing with Ortega, while Arias testified that Jones was the one arguing with Ortega. The defendant also notes that Arias testified that Jones stormed back towards the group just before the shots were fired, while Nieves testified that, at the time of the shooting, the shooter was "in the middle walking around" and "arguing with everybody[.]" According to defendant, "[t]he testimony of the two eye witnesses is clearly irreconcilable and reasonable doubt is abundant in this case." We are not persuaded.

Initially, we note that the testimony of Arias and Nieves was in agreement on one critical fact: Both identified the defendant as the shooter. While the trial justice recognized that Nieves and Arias "arrived with some baggage," he found that this baggage "was fully exposed to the jury." The trial justice elaborated: "Nieves had ingested several beers during the evening, and Arias was confronted with some prior inconsistent statements. Yet, in the end, the jury obviously found these two witnesses credible and reliable. I cannot fault their decision to do so." He found the testimony of these witnesses to be "trustworthy and credible." We are convinced that the trial justice ably complied with the new-trial-motion procedure, articulated adequate reasons for denying the motion, and did not overlook or misconceive material evidence or otherwise clearly err. We accordingly cannot fault his denial of the defendant's new-trial motion.

## Conclusion

For the reasons articulated above, we affirm the judgment.  The papers may be remanded to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Blake Covington.

**CASE NO:**    No. 2011-345-Appeal.
(P2/10-3415AG)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    July 2, 2013

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT:**

Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

For State:  Virginia M. McGinn
Department of Attorney General

For Defendant:  Kara J. Maguire
Office of the Public Defender